Leah J. PETERSON, Appellant,

v.

C. Harold WIRUM and Mary Lou
Wirum, Vernon C. Hickel and
Louis Palmer, Appellees.

No. 4704.

Supreme Court of Alaska.

March 27, 1981.

John H. Bradbury and Ann K. Stokes, Bradbury, Bliss & Riordan, Inc., Anchorage, for appellant.

Theodore M. Pease, Jr., Burr, Pease & Kurtz, Inc., Anchorage, for appellees Wirums.

William K. Jermain and Randall Simpson, Jermain, Dunnagan & Owens, Anchorage, for appellees Hickel and Palmer.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER and BURKE, JJ., and HANSON, Superior Court Judge.*

RABINOWITZ, Chief Justice.

The parties to this appeal are partners in a partnership known as Peterson Towers Associates (PTA), formed for the purpose of constructing and operating an office and condominium complex in Anchorage. The partners are appellant Leah Peterson (one-third interest), appellees Harold Wirum and Mary Wirum (collectively a one-third interest), and appellees Vernon Hickel and Louis Palmer (collectively a one-third interest).[1] Substantial differences arose among the partners concerning construction cost overruns and the amount owed by PTA to each partner.[2] After the structure was substantially completed, the partners entered into an agreement to resolve a number of these outstanding disputes. This agreement was reduced to writing and signed by all partners on October 28, 1977 (hereinafter "October agreement"). This agreement established, among other things, that PTA owed $1,365,000 to Hickel and Palmer, and specified that PTA was to pay $650,000 to Hickel and Palmer to reduce the debt, "upon receipt of financing from Pacific Mutual."

Pacific Mutual Insurance Company subsequently declined to lend the $650,000. In May 1978, Peterson informed the other partners that she did not consider the October agreement to be valid. The Wirums subsequently filed a complaint against Peterson, Hickel, and Palmer, seeking a declaratory judgment that the October agreement was valid and an order compelling the parties to carry out the terms and intent of the October agreement, including the requirement that PTA borrow $650,000 to repay Hickel and Palmer. Hickel and Palmer filed an answer admitting all the allegations in the Wirum complaint and a crossclaim against Peterson which incorporated those allegations. Peterson answered the complaint by alleging that the loan from Pacific Mutual was a condition precedent to enforcement of the October agreement, failure of which rendered the agreement invalid.

Both Peterson and the Wirums moved for summary judgment on the issue of the validity of the October agreement. The superior court denied Peterson's motion and granted the Wirums' motion.

Shortly after the Wirums had filed their complaint seeking enforcement of the October agreement, Vern Hickel Construction Co. (VHCC) filed a claim of lien against the partnership property for labor and materials valued in excess of $1,300,000 and interest thereon from the date of the October agreement. Subsequently, Hickel had $300,000 in partnership funds transferred to VHCC and the Alaska National Bank of the North to pay construction costs for the

---

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

1. Leah Peterson conveyed two lots valued at $250,000 to PTA in return for her one-third partnership interest. The Wirums conveyed a third lot, upon which the complex was built, and contributed architectural services valued at $125,000 to PTA in return for a one-third inter-est. Hickel and Palmer contributed construction, administration, and general contractor services valued at $250,000 in return for their one-third interest.

2. Construction costs exceeded the original estimate of $7,000,000 by some $4,000,000 to $6,000,000.

partnership project. Hickel did this while the Wirums were out of town and without Peterson's knowledge and consent, and with knowledge of the Wirums' action to enforce the October agreement, but claims that extenuating circumstances justified the move. Upon learning of the transfer of partnership funds, Peterson filed a cross-claim against Hickel, alleging violations of fiduciary duty and of the partnership agreement, and requesting preliminary and permanent injunctive relief against further unilateral withdrawals by Hickel as well as immediate return of the $300,000. Peterson's motion for a preliminary injunction was denied.

VHCC in the meantime filed suit against PTA seeking foreclosure on its lien in the amount of the $1,300,000 debt to VHCC less the $300,000 already transferred by Hickel. VHCC, Hickel, and Palmer then filed a complaint against PTA and the other partners individually, seeking damages, accounting, and dissolution of PTA. Both these suits were joined with the original Wirum action.

In granting the Wirums' motion for summary judgment on February 15, 1979, the superior court ordered all the partners to cooperate in obtaining a loan for $650,000 on the best terms available. Peterson then moved for reconsideration of the judgment on February 22, 1979. However, two days later Peterson, apparently without informing her attorneys, and the other partners signed a loan commitment with Seafirst Mortgage Company for $650,000. Thereafter, Peterson moved for vacation of the summary judgment, and for the entry of judgment dismissing the entire consolidated case with prejudice, on the basis of a clause in the Seafirst loan commitment which conditioned the loan on:

> Release with prejuduce [of] any and all claims between the partners arising from the litigation filed in Superior Court of Alaska, Third Judicial District, Cause No. 78–5713 and related lawsuits.

Judgment in accordance with the February 15 summary judgment order was entered on April 6, 1979. The Wirums then opposed Peterson's motion to vacate and moved to amend the April 6 judgment to specifically order the partners to close the Seafirst loan. In this motion it was further requested that Peterson's cross-claim against Hickel for the $300,000 appropriation of partnership funds be dismissed with prejudice on grounds of mootness, and that VHCC's actions against PTA and the other partners be dismissed without prejudice. The superior court granted the Wirums' motion and entered an amended judgment.

Peterson's response was to file a notice of appeal to this court and a motion for a stay of judgment. The Wirums countered by moving under Civil Rule 70 for an order directing the clerk of the superior court to execute the Seafirst loan documents on behalf of Peterson. The superior court signed the Civil Rule 70 order, commenting that it was not requiring Peterson to do anything she had not previously agreed to do in writing.[3]

I. *Whether the superior court correctly disposed of the issue of the enforceability of the October 28 agreement by summary judgment.*

Peterson's first contention in this appeal is that to reach the conclusion that the October 28 agreement was enforceable, despite the failure to obtain the loan from Pacific Mutual, the superior court must have determined that the parties considered the source of the loan to be immaterial. Peterson argues that this reasoning required the superior court to consider and weigh extrinsic evidence regarding the intent of the parties, and thus that summary judgment in favor of the Wirums was inappropriate under Civil Rule 56.[4]

▉ Peterson is correct in asserting that summary judgment is inappropriate when the affidavits and other evidence be-

---

3. Because the notice of appeal deprived the superior court of jurisdiction to enter this order, various motions followed to this court. Finally, on September 4, 1979, the superior court clerk executed the Seafirst loan documents on behalf of Peterson pursuant to a

reaffirmed order. The loan proceeds have been distributed according to the terms of the October agreement, despite continued litigation by Peterson against the lender to prevent this.

4. Implicit in our discussion of the appropriateness of the superior court's grant of summary

fore the trial court establish that a factual dispute exists as to the expressed intent of the parties. *Kincaid v. Kingham*, 559 P.2d 1044, 1047 (Alaska 1977); *Smalley v. Juneau Clinic Building Corp.*, 493 P.2d 1296, 1305 (Alaska 1972). But in the present case, the evidence before the superior court at the time of the cross-motions for summary judgment did not indicate any dispute as to the material facts pertaining to the intent of the parties. In such circumstances, summary judgment is appropriate. Alaska R.Civ.P. 56(c); *Wilcox Associates v. Fairbanks North Star Borough*, 603 P.2d 903, 906 (Alaska 1980).[5] Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative.[6] Rather, the court must look to express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement.[7]

■ The contract clause in question appears on a page of the agreement which tabulates the financial interests of the various partners in chart form. This chart lists $650,000 as a deduction from the Hickel/Palmer share, with the notation that that amount was "to be paid to Hickel/Palmer upon receipt of financing from Pacific Mutual."

The extrinsic evidence submitted to the court included two letters written by Mary Wirum. One, dated the same day as the agreement, was sent to PTA's tax accountants for use in keeping the partnership books. It states in pertinent part:

> The agreement is based on the assumption that we will receive from Pacific Mutual an increase of $650,000.00 in the existing first deed of trust. We expect their final approval of this amount by the end of next week. If the increase is not approved (and at this point we feel rather confident that it will be), we'll have to face that problem with some other solution.

The other letter was sent to Peterson on November 21, 1978, after Pacific Mutual denied the loan, and largely concerned Hickel's intent to sell his partnership interest. This letter referred to disbursements of PTA funds to the partners "in accordance with the October 28 agreement," but Wirum observed that she anticipated that Hickel "will object that all monies did not go to him since the Pacific Mutual thing fell through." The letter went on to state:

> According to that 10/28 agreement, which I suppose isn't worth much now

judgment to the Wirums and its denial of summary judgment to Peterson, as well as the court's order requiring specific performance and the parties' cooperation in obtaining a loan from Seafirst, is the conclusion that Peterson's appeal of these rulings was not rendered moot by any actions she took in the circumstances.

5. In *Wessells v. State, Dep't of Highways*, 562 P.2d 1042, 1046 n.9 (Alaska 1977), *quoting National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 586 (Alaska 1976), we said:

> Where the facts relating to surrounding circumstances are not in dispute, interpretation of the words of the contract is treated in the same manner as questions of law, and the standard used in reviewing factual findings is inapplicable.

6. This court has stated:

> While we are endeavoring to give effect to the intention of the parties, looking to their testimony as to their subjective intentions or understandings will normally accomplish no

more than a restatement of their conflicting positions.

*Day v. A & G Const. Co., Inc.*, 528 P.2d 440, 444 (Alaska 1974).

7. The extrinsic evidence which this court has stated may be looked to includes:

> [T]he language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated.

*Pepsi Cola Bottling Co. v. New Hampshire Ins. Co.*, 407 P.2d 1009, 1013 (Alaska 1965) (footnote omitted). *See also National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 584–85 (Alaska 1976); *Hendricks v. Knik Supply, Inc.*, 522 P.2d 543, 546 (Alaska 1974); *Smalley v. Juneau Clinic Bldg. Corp.*, 493 P.2d 1296, 1305 (Alaska 1972). The conduct of the parties after the contract was entered into is generally considered to be admissible as a probative extrinsic aid to determining the intent of the parties when they made the contract. 3 A. Corbin, Corbin on Contracts § 558 (1960).

since the $650,000.00 wasn't received from Pacific Mutual, Vern was owed $280,000.00 + $732,835.17 + $650,000.00 from the partnership = $1,662,835.17 total.[8]

In our opinion, the admissible extrinsic evidence cited by the parties thus reveals no dispute over any material issue of fact pertinent to discerning the intent of the parties in executing the October agreement. Therefore the superior court did not err in disposing of the dispute by way of summary judgment.

II. *Whether the superior court erred in granting the Wirums' cross-motion for summary judgment and denying Peterson's opposing motion for summary judgment.*

■ Peterson's primary argument in support of her contention that she is entitled to

summary judgment is that the language of the October agreement is unambiguous in stating that the Pacific Mutual loan was a condition precedent to the enforcement of the agreement. She therefore claims that extrinsic evidence should not have been considered in construing this term of the contract. Since we have recently ruled that extrinsic evidence regarding the intent of the parties may be used to interpret a contract regardless of whether the contract appears to be ambiguous on its face or not, this argument must be rejected. *See Wright v. Vickaryous*, 598 P.2d 490, 497 n.22 (Alaska 1979).[9]

■ In a case where the extrinsic evidence is not in dispute, we are not limited to the "clearly erroneous" standard in our review of the superior court's decision to grant or deny summary judgment on the

---

8. Another major piece of extrinsic evidence before the superior court was an affidavit from the managing partner of PTA, Mary Wirum, undisputed by Peterson and supported in part by exhibits, which established the following facts:

1) All partners were aware that although obtaining the Pacific Mutual loan was considered probable, it was not a sure thing at the time the October agreement was signed. This fact is verified in that a copy of the letter sent to the tax accountants and quoted above was sent to all partners. The terms of the Pacific Mutual loan were $650,000 at $9\frac{7}{8}\%$ interest, payable over thirty years, with no initial commitment fee.

2) When the Pacific Mutual loan was turned down a few days after the October agreement was signed, Wirum and Peterson had several discussions concerning the possibility of obtaining a loan from another source. When Wirum informed Peterson of a loan available at 12% interest, Peterson expressed a willingness to loan money herself to PTA at that rate, in order to more nearly equalize the debts of PTA to each partner. Discussions with Peterson concerning alternate loan sources continued for several months, during which time several alternate sources for a loan were identified. None of these offers were on terms as favorable as those originally offered by Pacific Mutual, requiring either a substantial commitment fee, higher interest, or a shorter payment term. All, however, were well within the cash flow capability of PTA to repay. Cash flow for PTA was estimated to be nearly $300,000 per year by Wirum.

3) The figures agreed upon by the partners in the October agreement were used by PTA's tax

accountants in setting up the PTA books and in the PTA tax return filed for 1977. Starting in November 1977, disbursals of PTA funds were made to each partner by Wirum according to the terms of the October agreement. These payments continued for six months to Peterson, who cashed the checks without objection until May 1978 when she tendered to Wirum the return of payments for March and April.

4) Wirum first became aware that Peterson did not intend to honor the October agreement on March 30, 1978, when Peterson tendered a written proposal for settlement which was inconsistent with the amount the October agreement specified was .owed to Hickel/Palmer by PTA, and proposed using a $650,000 loan to pay the Wirums, rather than Hickel, for services rendered.

The above assertions from Mary Wirum's affidavit satisfy the personal knowledge requirement of Civil Rule 56(e) since they appear to have been made on the basis of firsthand knowledge by the affiant and were substantiated by documents in the record.

9. This note in *Wright* states:

Extrinsic evidence refers to evidence other than the language of the contract that bears on the parties' intentions. Sometimes this court has stated or implied that resort to extrinsic evidence can occur only after a preliminary finding of ambiguity. So, theoretically, a court would examine extrinsic evidence to make a preliminary finding of ambiguity, and only after such a finding, would the court consider extrinsic evidence in construing the contract. This court has moved away from the cumbersome two-step process

basis of its interpretation of a contract. In such cases, interpretation of the contract is treated in the same manner as a question of law. *See Wessells v. State, Dep't of Highways*, 562 P.2d 1042, 1046 n.9 (Alaska 1977). Although we consider the question a close one, we have concluded that the superior court's grant of summary judgment to the Wirums and its denial of summary judgment to Peterson should be affirmed.

The primary purposes of the October agreement seem clear from its content—to establish what PTA owed to each partner, provide for present repayment of a portion of the large debt owed to Hickel/Palmer, and to provide for future distribution of profits to each partner for the purpose of reducing the indebtness of PTA to each party.[10]

As indicated previously the paramount legal question presented to the superior court for decision was whether the language "upon receipt of financing from Pacific Mutual" is a condition precedent. Peterson contends that the October 28, 1977, agreement was a compromise and that the obtaining of a loan on the very favorable terms offered by Pacific Mutual "was a material term of the compromise." Peterson argues that the term in question is rendered superfluous if not construed as a condition precedent.[11]

In further support of her position Peterson points to the two letters sent by Mary Wirum. In the first of those letters, Wirum stated to the PTA tax accountant that the October agreement was based on the assumption that the Pacific Mutual loan

would be approved; she subsequently stated to Peterson that she supposed the agreement "isn't worth much now" since the loan was not received. Peterson also disputes the Wirums' contention that the source of the loan to repay Hickel was not material. Her argument is that the low interest, long-term loan offered by Pacific Mutual was substantially more favorable to her interests in obtaining maximum short-term distribution of cash than other loan agreements would have been.

The Wirums characterize the relevant language in the contract as "shorthand" for the agreement to obtain a loan to pay the Hickel/Palmer debt, and argue that Pacific Mutual was specified only as the probable source of the loan at the time the agreement was entered into, since all parties were aware that the loan had not yet been approved. They dispute Peterson's conclusions regarding the Wirum letters, maintaining that these communications demonstrate that the parties could not have considered the Pacific Mutual loan to be a condition precedent. They point to language in the first letter to the effect that "if the Pacific Mutual loan is not approved, ... we'll have to face that problem with some other solution," as evidence that obtaining a loan from another source was an expected contingency.[12]

The Wirums also emphasize that the conduct of Peterson after the Pacific Mutual loan fell through indicated that for some time thereafter she acquiesced in the agreement by attempting to carry out its terms, agreeing to look for other loan sources,

... and that, according to Corbin, is the better approach. [citations omitted]

**10.** In interpreting a contract, the object is to give effect to the reasonable expectations of the parties. *Wright v. Vickaryous*, 598 P.2d 490, 497 (Alaska 1979). To ascertain these expectations, the court looks to the language of the disputed provision, the language of other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions. *Id.*

**11.** It is established that a contract should be interpreted to give effect, if possible, to all of

its provisions. *Stordahl v. Government Employees Ins. Co.*, 564 P.2d 63 (Alaska 1972).

**12.** They note that this letter did not caution the accountants to delay preparing the PTA books according to the financial agreement in the October contract until after the Pacific Mutual loan was approved. They further argue that the letter to Peterson taken in context only shows that Wirum did not consider the October agreement to be worth much if PTA could not pay Hickel the $650,000 because of the inability to obtain a loan from any source, since on the date of the letter no alternative financing had yet been located.

expressing an interest in loaning money herself to PTA, and accepting cash disbursements from PTA. They contend that Peterson's interpretation of the Pacific Mutual loan provision as a condition precedent is unreasonable under these circumstances, and that, given PTA's substantial cash flow, the exact terms of the loan agreement were not critical to any of the partners.

The Wirums have additionally advanced several legal arguments in support of the superior court's rulings on the summary judgment motions.[13] They refer to the genuine reluctance of courts to give effect to conditions precedent and the accepted requirement that such conditions be expressed in plain, unambiguous language or arise by clear implication. *U. S. v. Schaeffer*, 319 F.2d 907, 911 (9th Cir. 1963), *cert. denied*, 376 U.S. 943, 84 S.Ct. 798, 11 L.Ed.2d 767 (1964); *McAtee v. Wes-Lee Corp.*, 566 P.2d 442, 444 n.1 (Okl.1977); *Cheever v. Schramm*, 577 P.2d 951, 953 (Utah 1978).[14] The Wirums refer specifically to two cases in other jurisdictions which, they argue, indicate that a term specifying a certain fund source for the discharge of an existing debt does not necessarily create a condition precedent to performance unless the specification of that source as the only means of payment is express and unambiguous. *Campisano v. Phillips*, 547 P.2d 26 (Ariz.

App.1976); *Mignot v. Parkhill*, 391 P.2d 755 (Or.1964), *appeal after remand*, 430 P.2d 1007 (Or.1967). Peterson attempts to distinguish these cases on the ground that the amount and terms of the payment to Hickel/Palmer were in dispute prior to the October agreement, and argues that the terms of the Pacific Mutual loan were a part of the compromise reached in settling this dispute rather than merely an agreement to pay the debt out of a certain fund. Since the contracts in both *Mignot* and *Campisano* also fixed the amount and terms of payment of the debts, we are not persuaded that Peterson's proffered distinction is a persuasive one.[15]

On the basis of the record in this case, and the foregoing, we hold that the superior court's conclusion that the Pacific Mutual loan was not intended as a condition precedent should be affirmed. The language of the provision itself is not sufficiently unambiguous, given the larger purposes of the agreement, to establish that the Pacific Mutual loan was the only means of paying the Hickel/Palmer debt acceptable to the parties. In our view it would have been unreasonable to void the entire agreement, which established the equities and cash flow entitlements of all the parties, on the basis of Pacific Mutual's refusal to finance payment of the debt owed to

---

**13.** One of the arguments advanced is that the Pacific Mutual loan requirement was waived by Peterson's conduct in voicing no objection to attempts at obtaining other loans or in receiving disbursements under the terms of the agreement until six months after the loan application was rejected. *See Milne v. Anderson*, 576 P.2d 109, 112–13 (Alaska 1978). Given the basis for our decision in this appeal we need not consider this waiver argument.

**14.** Restatement of Contracts § 261 (1932) states: "Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise...." 5 W. Jeager, Williston on Contracts § 665, at 133 (3d ed. 1961) says of this doctrine:

Such an interpretation protects both parties to the transaction and also does not involve the consequences that a slight failure to perform wholly destroys all rights under the contract. [footnotes omitted]

**15.** Both cases applied the same principles, but *Campisano* found the contractual language suf-

ficiently clear to create a condition precedent in a provision that one party was to be paid by the other "out of" funds to be received in loan draws. *Mignot* reached the opposite result regarding a contractual provision postponing an obligation "until such time as" one party received funds from a specific outside source, holding that the term merely fixed the time of payment and did not create a condition precedent.

The clause in question in the case at bar provides that Hickel/Palmer would be paid "upon receipt' of the Pacific Mutual loan, but does not expressly state that it is the only means by which they can be paid. The clause in the instant case is more ambiguous than the *Campisano* provision and falls short of a condition precedent. *See Watson Const. Co. v. Reppel Steel & Supply*, 598 P.2d 116 (Ariz.App. 1979) (contractual agreement to pay "upon receipt" of funds from third party held not to create condition precedent).

Hickel/Palmer, especially when it is undisputed that PTA owes Hickel/Palmer more than $650,000. Further, many of Peterson's actions indicate that she acquiesced in and did not question the validity of the October 28, 1977, agreement until several months after learning of the failure to obtain additional monies from Pacific Mutual. We further note that a fairly persuasive argument is made that the terms of the Seafirst loan were not substantially dissimilar to those anticipated from Pacific Mutual. Given the foregoing and the disfavor with which conditions precedent are viewed by the law, we affirm the superior court's grant of summary judgment to the Wirums and its denial of summary judgment to Peterson.[16]

III. *Whether the superior court erred in ordering specific performance of the October 28, 1977, and February 24, 1979, agreements.*

We have determined that the superior court did not err in ordering specific performance of the two agreements in question for several reasons. The superior court's ruling that the parties did not intend the obtaining of a loan from Pacific Mutual to be a condition precedent to performance of the October 28 agreement has been affirmed. Implicit in this holding is the conviction that it is a plausible conclusion from the particular facts of this case that the parties' reasonable expectations were that the Hickel/Palmer debt was to be paid and that the other terms of the agreement were to be carried out even if the Pacific Mutual loan fell through. Further, we think that the superior court's decree requiring the parties to cooperate in obtaining another loan upon the best terms available did not interfere with their reasonable expectations. Since disbursements from the partnership's cash flow were made for six months to the partners according to the terms of the October 28 agreement, there has in fact been substantial reliance upon the contract's validity. Finally, we are of the view that the contract was sufficiently definite to permit its specific enforcement.[17] We thus affirm the superior court's decision to specifically enforce the subject agreements.[18]

**16.** The Wirums have also argued that the superior court's ruling can be sustained under the doctrine of substantial performance. It is established that performance in good faith will discharge a condition precedent even if there are minor and inconsequential deviations from the contract terms. Implicit in this legal argument of the Wirums is the assumption that the terms of the Seafirst loan are sufficiently close to those of the Pacific Mutual loan to constitute substantial compliance with the October agreement.

Since we have concluded that the term in question is not a condition precedent we need not address the substance of this argument although we do note it appears meritorious.

**17.** In *Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971), we emphasized that the definiteness required for specific performance is that of "reasonable certainty." Regarding the reasonable expectations of the parties to a contract, we said the following:

In general it has been said that the primary underlying purpose of the law of contracts is the attempted 'realization of reasonable expectations that have been induced by the making of a promise.' In light of this underlying purpose, two general considerations become relevant to solution of reasonable certainty-specific performance problems. On the one hand, courts should fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are fairly clear. The parties to a contract often cannot negotiate and draft solutions to all the problems which may arise. Except in transactions involving very large amounts of money or adhesion contracts to be imposed on many parties, contracts tend to be skeletal, because the amount of time and money needed to produce a more complete contract would be disproportionate to the value of the transaction to the parties. Courts would impose too great a burden on the business community if the standards of certainty were set too high. On the other hand, the courts should not impose on a party any performance to which he did not and probably would not have agreed. Where the character of a gap in an agreement manifests failure to reach an agreement rather than a sketchy agreement, or where gaps cannot be filled with confidence that the reasonable expectations of the parties are being fulfilled, then specific enforcement should be denied for lack of reasonable certainty. [footnotes omitted]

**18.** Peterson also argues that by ordering the parties to cooperate in obtaining and disbursing the $650,000 loan according to the terms of the

IV. *Whether the superior court erred in not enforcing paragraph 14 of the Seafirst loan commitment.*

Paragraph 14 of the Seafirst agreement states that a condition of extending the loan is:

Release with prejudice [of] any and all claims between the partners arising from the litigation filed in Superior Court of Alaska, Third Judicial District, Cause No. 78–5713 and related lawsuits.

Cause No. 78–5713 is the Wirums' action for specific performance of the October agreement. All the other claims in this dispute were filed and active at the time this commitment agreement was drafted in December, 1977. All the claims had been consolidated with the Wirum suit at the time the agreement was signed on February 24, 1978. Peterson argues that the superior court's amended judgment altered the unambiguous terms of this agreement, since it dismissed Peterson's cross-claim against Hickel with prejudice but affirmed the summary judgment decision and dismissed Hickel's claims without prejudice.

The Wirums argue on appeal that the circumstances show that Seafirst re-extended its commitment offer and finalized the loan papers with knowledge of the superior court's actions, and thereby waived the conditions expressed in paragraph 14. The original commitment offer expired on December 27, 1977. Seafirst re-extended it by telegram six days after the summary judgment decision, but made no changes in the terms and conditions except to extend the time the offer would remain open. Peterson signed the commitment three days later. On April 11, 1978, Seafirst reaffirmed by letter that the terms of the December commitment remained unaltered except for changes unrelated to paragraph 14.

 We question whether the other partners would have signed the commitment if they had believed it would invalidate the summary judgment order upholding the validity of the October agreement. It is also questionable that Seafirst would have extended the loan, given the implicit purpose of paragraph 14 to end disputes among the partners over the October agreement, if it had thought the clause would result in a renewal of disputes over the terms of that agreement. Thus, Peterson's expressed expectations that she signed the Seafirst loan commitment with the understanding that it would effect vacation of the summary judgment order and open the October agreement to renegotiations are unreasonable in light of the circumstances surrounding the signing of the commitment.

 There remains the further question of whether paragraph 14 mandates that the Hickel and VHCC suits against PTA and the other partners be dismissed with prejudice, rather than without prejudice as was ordered by the superior court. These suits were based on matters arguably independent of the October agreement. One was for foreclosure of VHCC's lien against PTA property, based on the debt owed for construction costs; the other was for damages,

October agreement, despite the fact that Hickel had already appropriated $300,000 of the amount agreed to be paid Hickel/Palmer, the superior court went beyond the terms of the October agreement. The effect of the amended judgment was to order $950,000 to be immediately disbursed among the partners, rather than the $650,000 payment envisioned in the October agreement. This fact does place the specific performance order beyond the scope of the parties' reasonable expectations as reflected in the October 1977 agreement. *See Byrnes v. Mercier,* 590 P.2d 906 (Alaska 1979). Peterson voluntarily signed the Seafirst loan commitment knowing that her cross-claim against Hickel would be dismissed with prejudice by virtue of paragraph 14 of the document.

This action on her part obviates her argument as to the scope of the superior court's specific enforcement decree.

We also reject Peterson's argument that the effect of the superior court's order for specific performance was to alter the PTA partnership agreement because this agreement expressly prohibited the borrowing of money by PTA without the consent of all of the partners. This argument fails to meet the holding that the Pacific Mutual loan was not a condition precedent to performance; that all the parties did consent to obtain a loan to pay the Hickel debt; and that to hold each partner to that promise is not a distortion of the essential terms of the agreement.

accounting and dissolution of the partnership, "based on the inability of the partners to cooperate in operating the partnership business and in securing a loan." Nonetheless, they are clearly "claims between the partners arising from ... lawsuits [related to the Wirum action]," since they were consolidated with that action on February 15, 1978. It is not reasonable that Seafirst would have committed itself to the loan without assurance that the prior lien would not be foreclosed and dissolution of the partnership avoided. Seafirst eventually closed the loan with knowledge that these claims were dismissed without prejudice, however, so this disposition was evidently acceptable to it. But that does not obviate Peterson's argument that dismissal with prejudice was the condition upon which she signed the commitment. We therefore conclude that the suits instituted by Hickel and VHCC should have been dismissed with prejudice.[19]

The judgment of the superior court as modified in accordance with this opinion is AFFIRMED.

MATTHEWS, J., not participating.

---

19. We deem it appropriate to note our conclusion that the dismissal with prejudice of Peterson's cross-claim against Hickel was also mandated by the language of paragraph 14 of the commitment (to which she agreed).