Joseph A. PHILBIN, d/b/a Philbin
Construction, Appellant,

v.

MATANUSKA–SUSITNA BOROUGH,
Appellee.

No. S–8573.

Supreme Court of Alaska.

Nov. 19, 1999.

Kenneth D. Albertsen, Palmer, for Appellant.

John L. Aschenbrenner, Assistant Borough Attorney, and Michael Gatti, Borough Attorney, Palmer, for Appellee.

Before MATTHEWS, Chief Justice; EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. *INTRODUCTION*

Before he was paid, a contractor signed a release. The superior court held that the release barred his breach of contract action. Because the contractor raised genuine material fact disputes about the intended effect of the release, we reverse the summary judgment entered against him.

## II. *FACTS AND PROCEEDINGS*

Joseph Philbin, doing business as Philbin Construction, entered into a written contract with the Matanuska–Susitna Borough on October 6, 1995 to supply, load, haul, and deliver approximately 9,250 cubic yards of crushed gravel.[1] The gravel was to be overlaid on Beverly Lakes Road, Vine Extension Road, and Meadow Lakes Road, in that order. The borough issued Philbin a notice to proceed on October 10; work was to be completed by November 6.

Although Philbin thought he could complete the project within the time the contract allotted, by October 20 the project was behind schedule. Chuck Kaucic, a project manager at the borough's public works department, met that day with Philbin and discussed the project's status. At that meeting Kaucic gave Philbin a letter dated October 19 asking for a revised schedule of anticipated quantities and delivery times, through completion of the project.[2]

By October 24 Philbin had only completed the first, Beverly Lakes Road, portion of the contract. At the suggestion of the borough's construction inspector, on October 25 Philbin billed the borough $19,608 for that portion of the contract. Philbin blamed his lack of progress on deteriorating weather which made crushing rock difficult and caused equipment breakdowns. Moreover, cold weather caused the road surfaces to freeze, preventing installation of more rock.

In early November but before November 6, Kaucic and Philbin met and discussed the possibility of a winter shutdown. A winter shutdown would have allowed Philbin to carry the project over to the spring. Philbin testified that Kaucic instructed him to shut down due to the onset of winter, and that written notification of a winter shutdown would be forthcoming.[3] Kaucic denied telling Philbin to stop producing material. Rather, he testified that he spoke to Philbin

---

1. Because this case was dismissed on summary judgment, our description of the facts draws all permissible inferences in favor of the non-movant, Philbin. *See Maddox v. River & Sea Marine, Inc.,* 925 P.2d 1033, 1035 (Alaska 1996).

2. No such letter is in the record. *See infra* note 3.

3. Some months after Philbin so testified in his deposition in this case, he testified, at the trial of a related claim, that Kaucic in fact handed him a letter officially notifying him to stop producing crushed gravel. According to Philbin, the letter also indicated that he and the borough should discuss restarting in the spring. But no such letter is in the record in this appeal. It may be that this was the letter dated October 19 regard-

about the possibility of shutting down and restarting in the spring if the freezing road conditions prevented further work in 1995.

Regardless of what was said at that meeting, the borough, by letter dated November 6, 1995, terminated the contract for nonperformance. The letter stated, in part:

> This letter is to serve as official notification that the Matanuska–Susitna Borough is terminating the Load, Haul and Supply Gravel Agreement contract signed on October 6, 1995.... This agreement is being terminated under Section 10A which states "This Agreement may be terminated by the Borough if the Contractor fails to perform any obligation under this Agreement." You are in noncompliance....
>
> ... As of today, 2,280 cubic yards of the 9,250 cubic yards specified in the agreement have been produced and hauled....
>
> ... [I]t has been agreed that in the best public interest the Matanuska–Susitna Borough must terminate this agreement effective 12:01 a.m. November 7, 1995.

On November 8 Philbin met with executives from the borough's public works department; they reiterated the borough's decision to terminate the contract. But they suggested that Philbin submit a written proposal regarding the possible purchase of crushed rock the following spring. Philbin testified that he declined that offer until he could speak to an attorney.

Philbin later executed an affidavit describing his discussions with the borough and his understanding based on the November 8 discussion of what the borough would do. We discuss that affidavit below in more detail.

On November 15 Philbin picked up a borough check for the Beverly Lakes Road portion of the contract. Before giving Philbin the check, the borough required him to sign a form entitled "CONTRACTOR'S RELEASE AND AFFIDAVIT OF PAYMENTS OF DEBTS AND CLAIMS." The form stated that "in consideration of the final payment ... the undersigned contractor ... releases and discharges the Matanuska–Susitna Borough ... from any and all further claim, debt, charge, demand, liability or other obligation whatsoever under or arising from said contract ...." By his handwritten reservation to the release on lines provided for the purpose, Philbin reserved claims to recover payments to individuals to whom he owed money for the rock-crushing equipment.

The following spring the borough refused to buy additional crushed rock from Philbin. In April 1997 Philbin sued the borough, alleging that the borough's refusal in the spring of 1996 to purchase the remaining "Contract material" from Philbin was a breach of contract. Philbin's complaint did not claim that the borough breached the contract by issuing the November 6, 1995 termination letter. The borough raised the release as an affirmative defense, and moved for summary judgment. Enforcing the release, the superior court granted the borough's motion. Philbin appeals.

## III. DISCUSSION

### A. Standard of Review

■ We review a grant of summary judgment de novo.[4] Drawing all reasonable inferences in favor of the non-movant, we determine whether the parties genuinely dispute any facts material to a viable legal theory and, if not, whether the undisputed facts entitle the movant to judgment as a matter of law.[5] The moving party bears the initial burden of proving through admissible evidence (1) the absence of genuine fact disputes, and (2) its entitlement to judgment as a matter of law.[6] Once the

ing a revised schedule that Kaucic hand delivered to Philbin on October 20. *See supra* note 2.

**4.** See Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell, 956 P.2d 1199, 1200 (Alaska 1998).

**5.** See id.

**6.** See Shade v. Co & Anglo Alaska Serv. Corp., 901 P.2d 434, 437 (Alaska 1995).

moving party has established a prima facie case, "the non-movant is 'required, in order to prevent entry of summary judgment, to set forth specific facts showing that he could produce admissible evidence reasonably tending to dispute or contradict the movant's evidence, and thus demonstrate that a material issue of fact exists.' "[7]

■ Whether the trial court applied the law correctly is a question of law which we review de novo.[8] "Under this standard, it is our duty to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

### B. The Parties' Intentions and Understanding of the Release Document

■ Philbin first argues that the evidence demonstrated a factual dispute concerning the parties' intent when he signed the release. He also argues that there is a factual dispute as to whether factors exist sufficient to set aside the release, precluding summary judgment.[10] The borough argues that the release is clear and unambiguous, that Philbin has not established by clear and convincing evidence that the release should be set aside, and that Philbin's unilateral mistake in understanding the release cannot excuse its application to him.

In our prior cases we have used two approaches to determine whether a release is enforceable. Though consistent, they vary in their emphasis.

Under the first approach, a release is to be construed according to the parties' intent. This approach potentially raises questions of fact.[11] The parties' intent is determinative.[12] Accordingly, summary judgment is inappropriate if there is a genuine fact dispute as to the parties' intent.[13]

The second approach focuses on the aggrieved party's understanding of the nature of the instrument he or she has signed.[14] Under this approach, releases are presumptively valid and the releasor must show by clear and convincing evidence that the release should be set aside.[15] In addition, we have stated that "for a release to be effective it must be given with an understanding of what is being released."[16] But we have also stated that absent a showing of coercion or fraud, a mistaken understanding of the contents of a release is not sufficient to justify setting it aside.[17]

■ Under either approach, the focus is on what a reasonable person would have

---

**7.** *Jennings v. State,* 566 P.2d 1304, 1309 (Alaska 1977) (quoting *Howarth v. First Nat'l Bank,* 540 P.2d 486, 489–90 (Alaska 1975)) (internal brackets omitted).

**8.** *See Langdon v. Champion,* 752 P.2d 999, 1001 (Alaska 1988).

**9.** *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**10.** Philbin also argues that a fact dispute exists as to whether the borough validly terminated the contract. But this question is only relevant to the extent it implicates Philbin's understanding and intent when he signed the release. Therefore, we will discuss it in context of that issue.

**11.** *See, e.g., Schmidt v. Lashley,* 627 P.2d 201, 203 n. 4 (Alaska 1981).

**12.** *See id.* at 204 n. 7.

**13.** *See Alaska Continental, Inc. v. Trickey,* 933 P.2d 528, 534 (Alaska 1997).

**14.** *See, e.g., Ahwinona v. State,* 922 P.2d 884, 887 (Alaska 1996); *Witt v. Watkins,* 579 P.2d 1065, 1067–68 (Alaska 1978).

**15.** *See Ahwinona,* 922 P.2d at 887 ("[O]nce the party relying on a release establishes that it was given with an understanding of the nature of the instrument, the burden is on the releasor to show by clear and convincing evidence that the release should be set aside."); *Mitchell v. Mitchell,* 655 P.2d 748, 751 (Alaska 1982); *Witt,* 579 P.2d at 1067–68.

**16.** *Alaska State Hous. Auth. v. Sipary,* 668 P.2d 824, 828 (Alaska 1983) (citing *Schmidt,* 627 P.2d at 204).

**17.** *See Ahwinona,* 922 P.2d at 887. *See also Mitchell,* 655 P.2d at 753 (refusing to set aside settlement, stating that releasor's mistake was "legally irrelevant because the [settlement] clearly and unambiguously dismisses the entire lawsuit").

understood the release language to have meant.[18]

The evidence permits a reasonable inference that Philbin, based on his November 8 discussion with Kaucic, justifiably believed that the borough would purchase the remaining material, and that, notwithstanding the November 6 termination letter, the borough had not ruled out the possibility that Philbin could complete the contract in the spring of 1996. This evidence is found in part in two paragraphs of Philbin's affidavit opposing summary judgment:

> 6. I discussed with Borough personnel my intentions to complete the contract and produce all of the contract material prior to the time the Borough would need the material in the spring of 1996. It was my understanding from Project Manager Charles Kaucic that the Borough would purchase the remaining material from me in late spring 1996 after the sub-base had adequately thawed and could be properly prepared. At that time, no one told me that the material would not be purchased by the Borough from me in the spring.
>
> . . . .
>
> 9. At the time that I signed the document, the Borough had not refused to purchase the additional material that had been produced under the contract and that was presently stockpiled and ready for use. Rather, Borough personnel were discussing with me the options of either the Borough purchasing the stockpiled material on hand at that time, or me continuing with production to produce all needed material by spring.

Based on this understanding, Philbin would have had no reason to expect that the release he signed on November 15 would preclude him from asserting a breach of contract claim against the borough in the event the borough declined to purchase the remaining gravel and permit him to complete the contract.

Other evidence supports the reasonableness of this interpretation. Kaucic testified in deposition that as of November 2 or 3, a winter shutdown was necessary, and that he had informed Philbin that they could not continue because of the weather. His affidavit permits an inference that he talked with Philbin about completing the project in the spring if weather prevented further work in 1995. Although Kaucic characterized this as a "hypothetical" possibility, his testimony that freezing weather prevented continuation removes that factual contingency.

There is also some evidence that the borough itself did not consider the release, when Philbin signed it, to foreclose a breach of contract claim. First, it appears the borough had decided as of November 3 to obtain its standard "lien release" even before it issued the termination letter. There is evidence to the contrary, but given Philbin's assertions about a November 8 conversation with Kaucic, a fact finder could find that the borough had decided to require him to sign the standard release even before it decided to terminate the contract. Second, the form of the release suggests it was primarily intended to protect the borough from lien claims. The borough's Acting Director of Public Works referred to it on November 3 as a "lien release." And the claims Philbin excepted from the release were those of equipment suppliers, who might have asserted lien claims against the borough. Philbin's reading of the release form was therefore consistent with it being a "lien release."

Philbin's theory that the release covered only that part of the contract relating to Beverly Lakes Road is also supported by the language of the payment request submitted by the public works department to the bor-

---

18. *See Johnson v. Schaub,* 867 P.2d 812, 818 n. 12 (Alaska 1994). *Cf. Martech Constr. Co. v. Ogden Envtl. Serv., Inc.,* 852 P.2d 1146, 1150 n. 8 (Alaska 1993). In *Martech,* we considered the scope of a release that included "blatantly broad language to cover all possible causes of action."

*Id.* at 1152. We upheld the application of the release to a later-arising dispute on grounds that the disputed claim was "reasonably ascertainable" at the time the release was executed. *Id.* at 1151–52.

ough receiving department. That request sought "partial" payment under the contract and indicated that the contract performance was "incomplete."

Further, the borough could not have insisted that Philbin execute a complete release as a condition to payment for the initial gravel deliveries because that would have been coercive and in bad faith.[19] In other words, it could not have expected Philbin to give up any possible contract breach claim in exchange for paying him what he had already earned for his partial performance of the contract to date.[20] And the release form permitted the contractor to except from the release particular "specified claims." As the borough's counsel explained at oral argument, this would have permitted Philbin to except a breach of contract claim. Accepting this assertion at face value, it means that the borough, in demanding that Philbin sign the release, had no reasonable advance expectation that the release as finally executed would preclude a breach of contract claim. This implies that it did not intend the release to encompass a breach of contract claim.

Finally, it is significant that Philbin affined that the borough did not raise the release as a defense when, in the spring of 1996, Philbin broached the issue of the completion of the contract with the borough. Philbin also affied that the borough never mentioned "any 'release'" during the following year while Philbin attempted to negotiate with the borough "to resolve this matter short of litigation." The borough first raised the release as a defense to contract claims in May 1997, a year later. This implies that the borough never intended the release to cut off any breach of contract claim.

On the other hand, there is evidence to support the borough's interpretation of the release and its effect. And Philbin's testimony in his deposition and in another proceeding undercuts his affidavits. But this contrary evidence is not conclusive given the averments in Philbin's affidavit and the permissible inferences which we must draw in favor of the non-movant.[21]

The standard of proof for setting aside a release is clear and convincing evidence. But that standard only comes into play when a fact finder is called upon to consider the parties' reasonable expectations. Despite the borough's implied argument that we should apply that standard here, we refuse to do so. It has no direct application at the summary judgment stage.[22]

We conclude that summary judgment is improper, because there is a genuine fact dispute about what the parties intended when the borough paid Philbin for his partial performance of the contract and Philbin signed the release.

We do not agree with the borough's assertion that *Martech Construction Co. v. Ogden Environmental Services*[23] requires affirmance. We there held that a release barred suit, where (1) the release covered "claims of any nature whatsoever," (2) the settlement clearly "sought to resolve the entire transaction," and (3) the later dispute was "reasonably ascertainable" when the release was signed.[24] Although the release Philbin executed covers "any and all further claim[s] ... whatsoever," and the subsequent dispute might be described as "reasonably ascertainable," it is not clear that the settlement sought to resolve the entire transaction, for the reasons we noted above.

---

**19.** *See* Restatement (Second) of Contracts § 175 (1981) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.").

**20.** Such a requirement could constitute economic duress. *See Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 20–23 (Alaska 1978) (setting out elements of economic duress).

**21.** The testimony we refer to here includes the same testimony quoted at length by the dissent.

**22.** *See* Alaska R. Civ. P. 56(c); *Moffatt v. Brown,* 751 P.2d 939, 944 (Alaska 1988).

**23.** 852 P.2d 1146 (Alaska 1993).

**24.** *Id.* at 1151–52.

## C. *Effect of AS 45.01.107*

 Philbin argues that to read the release as the borough does would require a conclusion that he released all contract claims, even as to what he calls Phases II and III of the contract, without receiving any additional consideration.[25] The borough claims that AS 45.01.107, Alaska's codification of Uniform Commercial Code (UCC) § 1–107, applies, and that because Philbin executed the release after the borough allegedly breached the contract, no consideration was required. Alaska Statute 45.01.107 provides:

> *Waiver or renunciation of claim or right after breach.* A claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and· delivered by the aggrieved party.

The UCC applies to a contract for the sale of gravel.[26]

The section headings are part of the code.[27] Philbin consequently argues that section 107 would not excuse the lack of consideration for a broad release, because he signed the release *before* the borough allegedly breached the contract by refusing in spring 1996 to purchase the remaining "Contract material." The borough claims that Philbin executed the release *after* the borough terminated the contract and canceled the purchase order.

Whether, for purposes of applying section 107, Philbin signed the release after a breach occurred is a fact question which remains to be determined. The superior court did not decide this issue, and we cannot say as a matter of law whether a breach occurred on

November 6, or whether the borough breached the contract, as Philbin's complaint alleges, in spring 1996 when it refused to purchase the remaining material.

Consequently, we cannot say as a matter of law whether section 107 applies here and whether the release was valid despite the want of consideration. This question will be before the superior court on remand, subject to being mooted if that court concludes that the parties intended the release to apply only to the Beverly Lakes Road portion of the contract.

Philbin also argues that even if section 107 does apply, the borough did not act in good faith because it indicated to him that the contract was only shut down for the winter and would resume in the spring. He asserts that not until spring 1996 did he know that the borough had breached its contract. The official comment to the UCC provides that section 107 "must be read in conjunction with the section imposing an obligation of good faith. (Section 1–203)."[28] "Good faith" is defined as "honesty in fact in the conduct or transaction concerned."[29]

But we cannot say as a matter of law that the borough failed to act in good faith such that the release must be invalidated, and Philbin has not asked us to do so.

## D. *Admissibility of Parol Evidence*

As an alternative ground for affirming, the borough argues that the release was an integrated contract which must be enforced as a matter of law. It consequently reasons that Philbin's theory of asserted partial release and partial payment is inconsistent with the plain and unambiguous language of the re-

---

**25.** We addressed a roughly analogous situation in *Pride v. Harris*, 882 P.2d 381 (Alaska 1994). In that case, Pride obtained a judgment against a truck driver for property damage caused in a collision. *See id.* at 382. On the check tendered to Pride to satisfy the judgment were the words "For Full & Final Settlement of all claims." *Id.* The driver argued that in endorsing the check, Pride executed an accord and satisfaction of any personal injury claims he might have had. *See id.* at 384. We held that such an accord would be invalid for lack of consideration. *See id.*

**26.** *See A & G Constr. Co. v. Reid Bros. Logging Co.*, 547 P.2d 1207, 1211 (Alaska 1976).

**27.** *See* AS 45.01.109.

**28.** UCC § 1–107, 1 U.L.A. 57 (1989).

**29.** AS 45.01.201(20).

lease. Thus, the parol evidence rule would preclude evidence contradicting the parties' agreement.

 The parol evidence rule states that an integrated written contract may not be varied or contradicted by prior negotiations or agreements.[30] Before the rule can be applied, three things must be determined: (1) whether the contract is integrated, (2) what the contract means, and (3) whether the prior agreement conflicts with the integrated agreement.[31] The superior court did not decide whether these three requirements of the rule were satisfied.

 We agree with Philbin's argument that the release is not an integrated agreement. There is no evidence that the release memorialized terms of an agreement between Philbin and the borough; it appears simply to have been a standard form presented to Philbin when he went to pick up his check. The release contains no integration clause. The borough has not disputed that it owed Philbin the payment he received upon signing the release. That circumstance is inconsistent with reading the release as having memorialized a previously reached agreement to waive all past, present, and future claims.

 In any event, it is not apparent that the rule applies here. The parol evidence rule does not apply "where a contract has been formed as a result of misrepresentation or mutual mistake."[32] Philbin's purpose in offering evidence about what he was told by borough representatives on November 2, 3 or 8 was to show that the parties did not intend that the November 15 release had the meaning the borough ascribed to it, not to vary or contradict the terms of the written contract. This was a permissible use of extrinsic evidence to prove mutual mistake.

### E. Philbin as "Commercially Sophisticated" Contractor

The borough argues that Philbin was a sophisticated contractor who must be deemed

to have understood that the release barred all claims arising under the contract. The record does not establish that Philbin's experience was such that he was compelled to read the contract in the same way the borough does. We do not see this to be the determinative issue.

## IV. CONCLUSION

Because there are genuine issues of material fact as to the parties' understanding of the release, we REVERSE and REMAND for further proceedings.

CARPENETI, Justice, dissenting.

The court today concludes that a disputed issue of material fact exists as to what the parties intended when the Matanuska–Susitna Borough presented and Joseph Philbin signed the release in question. Because I believe that a reasonable person in Philbin's position, viewing the evidence in the light most favorable to Philbin, must have understood the release language to mean that Philbin "release[d] and discharge[d] the Mat–Su Borough from any and all further claim, debt, charge, demand or liability whatsoever under or arising from" the contract he had entered, I would affirm the decision of the superior court.

Our cases make clear, and the court today reiterates, that the legal standard is "what a reasonable person would have understood the release language to have meant."[1] I agree that this is the test. But none of the six reasons posited by the court to support its conclusion that there are material facts in dispute on this issue withstands scrutiny. For that reason, I dissent.

The court first relies on two paragraphs in Philbin's affidavit to support the proposition that "Philbin ... justifiably believed that the borough would purchase the remaining mate-

---

**30.** See Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist., 778 P.2d 581, 583 (Alaska 1989).

**31.** See id.

**32.** Diagnostic Imaging Ctr. Assoc. v. H & P, 815 P.2d 865, 867 (Alaska 1991).

**1.** Op. at 1266.

rial."[2] First, we have made clear that after-the-fact subjective assertions of intent in contract situations are entitled to no evidentiary weight:

> Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative.[3]

Moreover, we have held that where the language of an agreement in a commercial context is clear on its face, and the releasor realizes he or she is signing a release, the conclusion that the release is enforceable may be compelled as a matter of law.[4] In *Ahwinona v. State*[5] we specifically rejected an argument based on the releasor's claim that he had not understood the release to preclude a later lawsuit: "Absent any showing of coercion or fraud, Ahwinona's mistaken *understanding of the release is not* sufficient to set it aside."[6] And in *Mitchell v. Mitchell* we said that the releasor's mistake was "legally irrelevant because the [settlement] clearly and unambiguously dismisses the entire lawsuit."[7] Finally, whether the borough and Philbin might reestablish a commercial relationship the following spring is not the issue. Even if Philbin believed a continuing relationship was possible, he could not have reasonably believed that such a relationship, if it did come about, would have been compelled by the contract which the borough clearly terminated several days earlier.

The court's second reason to reverse is Kaucic's deposition testimony that a winter shutdown was necessary as of November 2 or 3, and that he discussed this with Philbin, permitting an inference that Philbin might be allowed to complete the project in the spring.[8] There is no question that the borough and Philbin discussed that possibility before November 6. But there is likewise no question that the borough abandoned that approach when it unambiguously terminated the contract for nonperformance on November 6. The mere discussion of options cannot suffice to create a dispute of material fact when those discussions are followed by termination of the contract and an unambiguous release.[9]

The court's third reason—"there is also some evidence that the borough itself did not consider the release, when Philbin signed it, to foreclose a breach of contract claim"[10]—fails both legally and factually. Legally, we look to the language of the release and the parties' reasonable expectations concerning that language. The release's language is broad and all-encompassing: the contractor "releases and discharges the Matanuska–Susitna Borough, its officers, agents and employees of and from any and all further claim, debt, charge, demand, liability or other obligation whatsoever under or arising from said contract, whether known or unknown and whether or not ascertainable at the time of the execution of this instrument except specified claims . . . ." Factually, it should be of little consequence that a borough employee referred to the release as a "lien release."

2. *Id.*

3. *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981).

4. *Ahwinona v. State*, 922 P.2d 884, 886 (Alaska 1996).

5. *Id.*

6. *Id.* at 887.

7. 655 P.2d 748, 752–53 (Alaska 1982).

8. Op. at 1267.

9. In this regard, the court's statement about the discussion is puzzling: "Although Kaucic characterized this as a 'hypothetical' possibility, his testimony that freezing weather prevented continuation removes that factual contingency." Op. at 1267. That freezing weather as of early November forced a shutdown did not preclude the borough from terminating the contract, because Philbin was significantly behind the contract's production schedule well before that date. The borough was free to offer a continuation of the contract, but it was not required to do so.

10. Op. at 1267–1268.

Indeed, the only reasonable interpretation of the document is that it is a general release with a possible *exception* for lien and related claims.

The court's fourth rationale is that "Philbin's theory that the release covered only that part of the contract relating to Beverly Lakes Road is also supported by the language of the payment request submitted by the public works department to the borough receiving department. That request sought 'partial' payment under the contract and indicated that the contract performance was 'incomplete.' " [11] But this is irrelevant for several reasons. First, the request was an internal document, not communicated to Philbin. Second, the request was submitted on November 3, when the Borough had not yet announced its decision to terminate the contract; that announcement came three days later. As the Engineering Manager for the borough testified: "When this purchase order request for payment was received by borough purchasing personnel, they changed the 'P' [partial] to 'F' [full] on both lines, as *it was determined by that date* that this would definitely be a closed contract." (Emphasis added.) Finally, the release is clear on its face. How can an internal document, unseen by Philbin and subsequently properly modified to reflect the decision to terminate the contract, be used to justify a conclusion that Philbin's intent in signing the *release* is in dispute?

The court's fifth justification relies on the observation that "the Borough could not have insisted that Philbin execute a complete release as a condition to payment for the initial gravel deliveries because that would have been coercive and in bad faith." [12] I have no quarrel with this statement. But the bor-

ough did not do that. The release specifically allowed the releasor to except whatever claims he wished to except. Counsel for the borough properly admitted at oral argument that this would have allowed Philbin to except a breach of contract claim. The majority somehow turns this into the unwarranted conclusion that "[the borough] did not intend the release to encompass a breach of contract claim." [13] Philbin did not except any breach of contract claim, and the language of the release is otherwise extremely broad. Under these circumstances, the only reasonable interpretation of the release is that "any and all" claims, demands, or other obligations arising from the contract were released, unless specifically excepted.

The court last points to the borough's alleged failure to mention the release in subsequent negotiations when Philbin tried to resurrect the terminated contract the following spring. Using a party's negotiating technique in these circumstances as evidence of the party's intent in signing a document months earlier seems questionable. For one thing, the borough's reliance on the release in negotiations with Philbin would probably have been inconsistent with reaching a negotiated settlement of the dispute. For another, positions taken in settlement negotiations have never been relevant later when negotiations have proved unsuccessful. [14] I would give no weight to the borough's alleged failure to mention the release several months later in settlement negotiations when assessing the meaning of the release.

The court fails to set out [15] the compelling evidence that Philbin knew, when he signed the release, that the contract had been terminated and that he was releasing any and all claims arising under the contract (except

---

**11.** *Id.* at 1268.

**12.** Op. at 1268.

**13.** *Id.* at 1269.

**14.** *See* Alaska Rule of Evidence 408.

**15.** The court satisfies itself with the observation that this evidence "support[s] the borough's in-

terpretation ... [b]ut ... is not conclusive given the averments in Philbin's affidavit" and the inferences which must be drawn in favor of the non-movant. Op. at 1268. This approach ignores our well-established rule that subjective statements made during litigation are entitled to no weight "since such self-serving statements are not considered to be probative." *Peterson v. Wirum,* 625 P.2d at 870.

those that he specifically excepted). While he now argues that the contract remained open and he therefore had no reason to understand that the release he signed actually was a release of all claims "arising under the contract," there is no doubt that he knew the contract was terminated. His own words prove it:

> [F]our or five days [after the meeting with Mr. Kaucic] ... I got another letter ... stating that they've decided to terminate the contract, *I was irate. I've never had that happen.* You don't tell somebody you're going to make a winter shutdown, especially before the duration of the contract, and then let that time pass and then hand them a termination notice ... *I arranged a meeting with the Borough and I told them that within a two-week period come spring once the ground was thawed, I could absolutely guarantee that I could crush the material and well before the road restrictions lifted* .... I would like to go ahead and crush the material. *And they said no, they just didn't believe I could do it.* My record didn't look good because of this project.

(Emphasis added.) This testimony was given in a related case pitting Philbin against an equipment supplier on the contract in this case. In the same case, Philbin testified that the proposed winter shut-down option had been discarded by the borough, a decision with which he heartily disagreed. Specifically, he testified that he was "shocked" when he received the termination letter instead of a shut down order:

> In the context of the conversation [on November 2 or 3, Chuck Kaucic] informed me that the road surfaces were too hard to blade and prepare to accept gravel and then if we put gravel down on it, it wouldn't bond, it would come off. And at that point I was glad to hear that because I wasn't getting any production out of the plant at all. The material was frozen, lumped up. It wouldn't process right. *And it came as a shock after he'd—he'd orally told me that [—] to get this letter saying they terminated it. That it no*

*longer was considering picking back up in the spring to let me finish it.*

(Emphasis added.)

Given Philbin's own testimony, no reasonable fact-finder could conclude that, as of the time he signed the release, he reasonably believed that the road contract was still in effect, that he would resume work on it in the spring, and that the release only concerned the work already performed. A reasonable person in Philbin's position must have understood that he was releasing the borough from the claims he now seeks to pursue. Moreover, the law is clear that, absent coercion or fraud, even a mistaken understanding of the contents of a release is not sufficient to set it aside. Under these circumstances, and given the breadth of the release language, I believe that the superior court was correct when it found no material issues of fact in dispute. I would affirm that decision.