*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RICHARD R. WATKINSON, | ) | |
| | ) | Supreme Court No. S-17941 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-15-09715 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | No. 7677 – December 22, 2023 |
| | ) | |
| Appellee. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Richard R. Watkinson, pro se, Seward, Appellant. Noah I. Star and Ryan A. Schmidt, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, and Maassen, Carney, Borghesan, and Henderson, Justices.

HENDERSON, Justice.

## I.    INTRODUCTION

A self-represented prisoner sued the Department of Corrections (DOC) for intentional and negligent infliction of emotional distress. The prisoner alleged that DOC held him in administrative segregation (sometimes called solitary confinement) for 504 days and that corrections officers denied him any meaningful opportunity to appeal or be heard regarding his segregation. Among other claims, the prisoner

contended that the corrections officers' actions amounted to extreme and outrageous conduct that caused him severe emotional distress. The superior court granted summary judgment in favor of DOC, reasoning that DOC's conduct was not extreme and outrageous and that the prisoner's distress was not severe enough to give rise to liability.

We hold that this was an abuse of discretion, and we reverse the superior court's grant of summary judgment in DOC's favor as to the prisoner's intentional infliction of emotional distress (IIED) claim. We also vacate the superior court's order approving the attorney general's certification that individual corrections officers acted within the scope of their employment, reverse the court's denial of the prisoner's request to compel certain discovery, and remand for further proceedings consistent with this decision. We affirm the superior court's grant of summary judgment with respect to the prisoner's negligent infliction of emotional distress (NIED) claim.

## II.    FACTS AND PROCEEDINGS

### A.    Facts[1]

#### 1.    Watkinson's initial placement in administrative segregation

In September 2013 Alaska inmate Richard Watkinson was housed in a private prison facility in Colorado. DOC was in the process of transferring Alaska prisoners back to Alaska after the completion of the Goose Creek Correctional Center (Goose Creek).[2]

---

[1]    Because this is an appeal of a summary judgment order, our factual recitation relies on the superior court record, including exhibits, affidavits, responses to interrogatories, and transcripts. *Rich v. Valdez Motel Corp.*, 207 P.3d 552, 544 n.2 (Alaska 2009). In describing the facts, we make all inferences in favor of the nonmovant, Watkinson. *Blair v. Fed. Ins. Co.*, 433 P.3d 1048, 1051 (Alaska 2018) (citing *Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002)).

[2]    Ben Anderson, *Opening Soon:  Alaska's $240 Million Goose Creek Prison*, ANCHORAGE DAILY NEWS (June 24, 2012), https://www.adn.com/alaska-news/article/opening-soon-alaskas-240-million-goose-creek-prison/2012/06/25/.

Three days before Watkinson's transfer, he was placed in administrative segregation after an alleged altercation with a Colorado corrections officer. According to the reporting officer, Watkinson assaulted the officer in an attempt to destroy a contraband cell phone. Watkinson maintains his innocence. This was Watkinson's only violent disciplinary infraction while in Colorado.

After the incident a Colorado prison employee emailed the DOC director. While reporting that the officer was "not seriously injured," the employee said that he was "going to try to ensure [Watkinson] is prosecuted." Later that evening the director emailed other DOC officials that, when Watkinson arrived in Alaska, he was to be held in administrative segregation due to the incident. When Watkinson arrived at Goose Creek, prison officials placed Watkinson on administrative segregation under the most restrictive placement conditions, also known interchangeably as "Ad Seg Max" or "Ad Seg 10."[3]

Watkinson presented an undisputed description of the conditions associated with placement in Ad Seg 10 at Goose Creek. The cells are 7.5 by 12 feet and have no windows. The recreational areas, which are inside the prison, are 12 by 20 feet and made of solid concrete, with a window 30 feet above the ground. There is little to no natural light in segregation. Inmates in Ad Seg 10 eat all meals alone, and the only possibilities for social interaction are weekly counseling sessions and 15 minutes per day of telephone time. Inmates in Ad Seg 10 are not permitted in-person visits. Inmates on Ad Seg 10 status are confined to cells, alone, for at least 22 hours per day.

Three days after Watkinson's initial placement, DOC held an administrative segregation hearing to determine Watkinson's appropriate continued placement. At an administrative segregation hearing, the inmate has a right to assistance from a hearing advisor or, when the segregation is in connection with an

---

[3]    22 Alaska Administrative Code (AAC) 05.485(a)(10).

infraction that could be a felony, assistance from counsel.[4]  The inmate also has the right to challenge the factual basis for the administrative segregation, including by calling witnesses, presenting evidence, and making a statement to the hearing officer.[5]

Watkinson claims that the DOC officer providing him notice of the hearing did not inform him of his right to a hearing advisor and encouraged him to waive his own appearance at the hearing.  Before the hearing Watkinson was not given the opportunity to prepare a defense; instead, he was told he could select a hearing advisor at the beginning of the hearing.  Watkinson has consistently alleged that the hearing officer told Watkinson that she was instructed to place him in Ad Seg 10 and that the hearing's outcome was predetermined.  At the hearing, the incident report from Colorado was read into the record and Watkinson made a statement on his own behalf.  No other evidence or witnesses were presented.

Based on this hearing, DOC kept Watkinson in Ad Seg 10 because he had demonstrated "[a]ssaultive behavior toward[] staff."[6]  DOC recommended that Watkinson "remain in segregation until he ha[d] completed the Disciplinary-Board process."  Based on the report that he had assaulted the Colorado employee, DOC further found that Watkinson presented a substantial threat to the security of the facility.

After that hearing Watkinson repeatedly asked for the written decision in order to appeal, and he alleges he was discouraged from filing his appeal.  Watkinson appealed his initial placement in Ad Seg 10, citing various procedural violations during his initial hearing and maintaining his innocence.  Watkinson asked to be placed in a lower level of administrative segregation, Ad Seg 8, until the resolution of the

---

**4**     STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES, SPECIAL MANAGEMENT PRISONERS, ADMINISTRATIVE SEGREGATION 804.01.VII.C.1-2 (2014), https://doc.alaska.gov/pnp/pdf/804.01.pdf (hereinafter DOC POLICY 804.01).

**5**     *Id.*

**6**     *Id.* VII.B.3.a.(1)(a).

disciplinary process. Ad Seg 8 allows inmates to return to the general prison population after the resolution of disciplinary proceedings; Ad Seg 10 does not. Ad Seg 8 status allows for in-person small group mental health programs, outdoor recreation with one or two other inmates, eligibility for an MP3 player and more books, and in-person visits after 30 days. But even in Ad Seg 8, inmates are largely confined to their cells for most of the day, and must complete any recreation, visits, phone calls, and/or use of the law library within a two-hour period.

Watkinson's appeal was denied because he was "appropriately classified as Ad Seg 10 for an alleged incident [in Colorado] against a staff member." This was Watkinson's only appeal of his administrative segregation status. Review hearings of Ad Seg 10 status are held every four months.[7]

### 2. Watkinson's disciplinary hearing

Approximately 90 days after he was placed in Ad Seg, DOC held Watkinson's disciplinary hearing on December 11, 2013. The hearing had been scheduled for October but it was delayed. The only explanation given for the delay was "evidence." Before the hearing, Watkinson requested witnesses, records, and evidence, none of which was provided. Watkinson's hearing advisor "did not understand that it was his responsibility" to interview witnesses and obtain evidence.[8] Watkinson's two prisoner witnesses were present at Goose Creek during the hearing, but DOC did not make them available to testify at Watkinson's disciplinary hearing. DOC did not determine whether charges were filed in Colorado or obtain evidence or witnesses from

---

[7]     *Id.* VII.D.

[8]     Preparing witnesses and evidence is part of the hearing advisor's duties per regulation and DOC policy. 22 AAC 05.440(c); STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES, PRISONER RULES AND DISCIPLINE, DISCIPLINARY COMMITTEE/HEARING OFFICER AND BASIC OPERATION 809.04.D.2 (2012), https://doc.alaska.gov/pnp/pdf/809.04.pdf (hereinafter DOC POLICY 809.04).

Colorado.[9] Watkinson did not have counsel at the hearing. DOC officials said at the end of this hearing that they would dismiss the case if it came before them a second time, which Watkinson characterizes as an admission that the hearing was infirm.

The disciplinary committee found Watkinson guilty of the assault and imposed a penalty of "Time Served," but did not impose punitive segregation.[10] The DOC officers involved later acknowledged that time served was "not a typical punishment" to give for a high-level infraction. The officers admitted that Watkinson had "already served sufficient time in segregation with regard to the infraction he had committed." Watkinson appealed to the Superintendent and the Director of Institutions. Both appeals were denied, and Watkinson appealed the disciplinary decision to the superior court.

---

[9] Although DOC noted that the records were hard to get because the facility in Colorado closed, it seems that the Department of Law was able to obtain the relevant records from the facility in preparation for this litigation by simply asking the corporate headquarters.

[10] Although both types of segregation remove prisoners from the general population, they have different purposes and are governed by different policies. Administrative segregation is defined as a "form of separation . . . when the continued presence of the inmate in the general population poses a serious threat to life, property, self, staff, or other inmates or to the security or orderly operation of the institution." DOC POLICY 804.01. *supra* note 4, V. There is regular review of a prisoner's status but no limit on the duration of administrative segregation. *Id.* VII.D-H. Punitive segregation is defined as a "form of separation [in which] inmates who have committed serious violations of conduct regulations are confined . . . for short periods of time to individual cells separated from the general population." *Id.* V. Placement in punitive segregation is limited to 60 days and "only may occur after a finding of a rule violation at an impartial hearing." *Id.*; STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES, PRISONER RULES AND DISCIPLINE, PROHIBITED CONDUCT AND PENALTIES 809.02.VII.F (2013), https://doc.alaska.gov/pnp/pdf/809.02.pdf.

### 3. The remainder of Watkinson's time in administrative segregation

After Watkinson was found guilty at the disciplinary hearing, he joined the Step Down program in December 2013. The Step Down program is a voluntary program designed to rehabilitate Ad Seg 10 prisoners to ensure their safe return to the general population. According to Watkinson, if inmates do not participate in the Step Down program, they remain in segregation indefinitely. The major incentive for successful completion of the program is return to the general population, but there are also intermediate stage incentives as inmates progress through the program. At first Watkinson took issue with some aspects of the program; the Director of Institutions responded that the Step Down program would allow him to "return to [the general] population much sooner [than] otherwise would be the case" and that participation was Watkinson's choice, writing, "I hope you choose wisely."

After a review hearing in February 2014, DOC again recommended that Watkinson remain on administrative segregation, noting that he was "placed on Ad-Seg 10 status due to . . . assaulting a staff member," behavior that was "a severe threat to the safety and security of the facility." DOC recommended that he continue to engage in the Ad Seg 10 Step Down program. Watkinson was present at the hearing; he noted that he was appealing the disciplinary decision and that he had maintained clear conduct for his four months in segregation. After future review hearings, DOC repeated the same recommendation verbatim.

During 2014, Watkinson progressed through the Step Down program. The third phase was the least restrictive, and Watkinson was transferred to Step 3 of the program, Ad Seg 8 status, in August 2014.

Watkinson was scheduled to return to the general prison population in December 2014. But that month DOC extended his time in Ad Seg 8 by 60-90 days after an incident during mental health counseling, in which the counselor reported feeling verbally attacked by the inmates collectively. Watkinson was told of this change

in a meeting and, when he protested, he was told he was "not entitled" to an appeal of the decision. After he filed two grievances, DOC officials told Watkinson there was an appeal process. But DOC officials also reminded Watkinson that the Step Down program was voluntary, and told him that if he chose "not to go along with Unit Team recommendations," he could "go back to Ad Seg 10 Status." DOC officials also told Watkinson that it was "well within the [parameters] of the program to" retain inmates at the current level, and that his "continued focus on appe[a]ling and attempts at intellectualizing" was "not conducive" to rehabilitation.

Throughout his time in administrative segregation, Watkinson's appeal of the disciplinary decision was proceeding in superior court. In January 2015 DOC rescinded its disciplinary decision and removed the record from his file. The next month Watkinson completed the Step Down program and returned to the general prison population. In total, Watkinson was in administrative segregation for 504 days, 335 of which were spent in Ad Seg 10.

In March 2015 the superior court found that the disciplinary appeal was moot because "DOC had already reversed the guilty finding and removed the records from his file, because DOC was acknowledging that Mr. Watkinson had been improperly placed in administrative segregation." The court ordered DOC to return Watkinson to the general population and to remove all files and documents related to the Colorado incident. The court directed that DOC was not to use any of the allegations underlying the dismissed disciplinary infraction against Watkinson in any way.

### 4. Watkinson's emotional distress

Watkinson claims that he experienced "intense mental anguish and severe emotional distress" in administrative segregation. While in segregation, he suffered from "acute anxiety," insomnia, social withdrawal, a severe depressive state, and suicidal ideation. Watkinson described feeling as if he was "enduring intentional psychological torture." At times, he would have panic attacks or disassociate ("going ghost" in his terms) when feeling overwhelmed by his situation. Watkinson believes

his time in administrative segregation exacerbated previous mental illnesses, identifying the same feeling of " 'hollow numbness' and despair" that he had felt as a teenager, when he was "in the depths of . . . depression." These conditions persisted after his time in segregation, and he still struggles with social withdrawal and depression.

Watkinson later submitted affidavits from his video and telephonic visitors attesting to his severe distress, including that he would weep during visits. A psychiatric examination corroborated that prior to serving time in prison Watkinson had been diagnosed with several mental health conditions, including depression.

In Step Down Watkinson completed several anger management courses and group counseling. The Chief Mental Health Officer for DOC opined that Watkinson did not suffer from a serious mental illness, based on a review of his medical records, the records of mental health rounds in segregation, and his institutional file. According to the available record, the mental health rounds occurred roughly once a month and stopped in July 2014. The Chief Mental Health Officer claimed that Watkinson never expressed any mental or emotional distress to prison staff and that he had learned to cope with any distress through meditation. Watkinson claims that he did express his severe distress and feelings of hopelessness during the group counseling sessions, and notes those counselors did not provide testimony. He also claims he did not report his distress during mental health checks because he feared being forced to take medication or being put on suicide watch, an even more restrictive status where all bedding and personal property are removed.

B.    Proceedings

Watkinson filed his initial complaint in this matter in September 2015, an amended complaint in January 2016, and a second amended complaint in April 2016. In the first two complaints, Watkinson alleged several violations of the Alaska Constitution and sought monetary damages. DOC moved to dismiss these claims, arguing that Watkinson could not claim damages based upon violations of the Alaska

Constitution alone if there was an alternative remedy. Watkinson then filed a second amended complaint, removing his Alaska constitutional claims and preserving his IIED and NIED claims.

Extensive motion practice and discovery followed, leading to multiple orders relevant to this appeal. First, the State certified under AS 09.50.253(c) that the original DOC employee defendants were acting within the scope of their employment and moved to substitute the State as the defendant. Watkinson objected to the certification based on the nature of the conduct, arguing that the defendants' acts or omissions constituted "willful, reckless, or intentional misconduct, or [misconduct] with gross negligence or malice"[11] and therefore could not be certified as within the scope of employment. The superior court overruled Watkinson's objection and approved substitution of the State of Alaska in place of the DOC employees initially named as defendants in this case.

Second, Watkinson moved for in camera review of correspondence related to DOC's decision to remove his disciplinary infraction from his prisoner record. Watkinson asked in the alternative for the superior court to order DOC to give him the name of the individual who made the decision. Watkinson had filed several interrogatories asking why DOC removed the disciplinary report from his file during the previous litigation and who had authorized that removal. Caitlin Price, a sergeant at Goose Creek at the time, responded to the interrogatory that she did "not specifically recall who authorized the removal of the infraction." DOC further refused to answer Watkinson's interrogatories about the issue on grounds of attorney-client privilege. Watkinson argued that the requested information was relevant because it could tend to demonstrate DOC's awareness of serious constitutional infirmities in its disciplinary

---

[11]    AS 09.50.253(h)(1)(D).

process. After the issue was fully briefed, the superior court denied the motion in August 2019.

DOC moved for summary judgment, and the superior court granted summary judgment for DOC on Watkinson's IIED and NIED claims in August 2020. Regarding Watkinson's IIED claim, the superior court — resolving all factual issues in Watkinson's favor — determined that DOC's conduct, while concerning, was not extreme and outrageous. The court also concluded that the emotional distress Watkinson experienced was not severe enough to support an IIED or NIED claim because it did not go beyond what an ordinary prisoner would experience in the same situation. The superior court also concluded that DOC did not owe a duty toward Watkinson that could support an NIED claim.

Watkinson filed a motion for reconsideration, arguing that the superior court ignored "clear facts and provisions of law." The superior court denied reconsideration. The court noted that Watkinson asked it to refer to his initial complaint but then described how he had "made the strategic choice to amend his complaint a second time," to "omit[] all of the [c]onstitutional challenges he now raises," and "to focus exclusively upon issues of NIED and IIED." Accordingly, the court explained that Watkinson "may not now complain the [c]ourt overlooked his original constitutional challenges."

Watkinson appeals the superior court's dismissal of his IIED and NIED claims on summary judgment, the court's certification order, and its denial of his motion for in camera review.

III. STANDARD OF REVIEW

We review summary judgment orders de novo, and "will affirm a grant of summary judgment if there are no genuine issues of material fact and if the movant is

entitled to judgment as a matter of law."[12] "We draw all reasonable inferences in favor of the nonmoving party."[13] In order to survive summary judgment, the nonmoving party must demonstrate that a material issue of fact exists, by "set[ting] forth specific facts showing that [it] could produce admissible evidence reasonably tending to dispute or contradict the movant's evidence."[14] " '[T]he evidentiary threshold necessary to preclude the entry of summary judgment is low,' but the evidence supporting a claim must not be 'based entirely on "unsupported assumptions and speculation" and must not be "too incredible to be believed by reasonable minds." ' "[15]

We review for abuse of discretion a trial judge's threshold determination on the two major elements of IIED, whether the involved conduct was extreme and outrageous and the emotional distress was severe.[16] If this determination is made at the time of summary judgment, all reasonable inferences must be drawn in favor of the plaintiff.[17]

"The scope and existence of a duty of care are questions of law, which we review" using our independent judgment.[18] We review approval of scope of employment certifications by the attorney general de novo.[19] We review rulings on

---

[12] *Blair v. Fed. Ins. Co.*, 433 P.3d 1048, 1051 (Alaska 2018) (citing *Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002)).

[13] *Id.*

[14] *Alakayak*, 48 P.3d at 448 (second alteration in original) (quoting *Philbin v. Matanuska-Susitna Borough*, 991 P.2d 1263, 1265-66 (Alaska 1999)).

[15] *Lum v. Koles*, 426 P.3d 1103, 1109 (Alaska 2018) (alteration in original) (first quoting *Crawford v. Kemp*, 139 P.3d 1249, 1253 (Alaska 2006); and then quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014)).

[16] *Richardson v. Fairbanks North Star Borough*, 705 P.2d 454, 456 (Alaska 1985).

[17] *Jones v. State, Dep't of Corr.*, 125 P.3d 343, 346 (Alaska 2005).

[18] *Schack v. Schack*, 414 P.3d 639, 641 (Alaska 2018).

[19] *State, Dep't of Corr. v. Heisey*, 271 P.3d 1082, 1090 (Alaska 2012).

discovery disputes, including whether to conduct an in camera review, for abuse of discretion.[20]

"We hold self-represented litigants to a 'less stringent' standard than lawyers;" if "the essence of the self-represented litigant's argument can be easily discerned from the briefing, and the opposing party would not be prejudiced by its consideration, it should be considered."[21]

## IV. DISCUSSION

### A. It Was An Abuse Of Discretion To Dismiss Watkinson's Claim For Intentional Infliction Of Emotional Distress.

"To prevail on an IIED claim, a plaintiff must establish (1) that the defendant's conduct was extreme and outrageous, (2) that the conduct was intentional or reckless, (3) that this conduct caused the plaintiff emotional distress, and (4) that the distress was severe."[22] A trial judge "should make a threshold determination whether the severity of the emotional distress and the conduct of the offending party warrant a claim of [IIED]."[23] When the trial judge makes this assessment at the summary judgment stage, the judge must draw factual inferences in favor of the plaintiff.[24]

Watkinson challenges the superior court's decisions that DOC's conduct was not sufficiently extreme and outrageous and that his emotional distress was not sufficiently severe to warrant a claim of IIED. We observe that the superior court's grant of summary judgment against Watkinson on these points appears to be based not upon any failure of Watkinson to set forth admissible evidence establishing or

---

[20] *Christensen v. NCH Corp.*, 956 P.2d 468, 473 (Alaska 1998).

[21] *Leahy v. Conant*, 447 P.3d 737, 742-43 (Alaska 2019).

[22] *Cameron v. Beard*, 864 P.2d 538, 548 (Alaska 1993) (citing *Teamsters Loc. 959 v. Wells*, 749 P.2d 349, 357 (Alaska 1988)).

[23] *Richardson v. Fairbanks North Star Borough*, 705 P.2d 454, 456 (Alaska 1985).

[24] *Jones v. State, Dep't of Corr.*, 125 P.3d 343, 346 (Alaska 2005).

supporting genuine issues about what DOC did or did not do and about the nature of his resulting distress, but upon the court's determination that, even assuming Watkinson's assertions were all true, the conduct established was not sufficiently extreme and outrageous, and the resulting distress was not sufficiently severe, to support an IIED claim. Drawing all factual inferences in Watkinson's favor, we hold that the superior court abused its discretion as to each determination, and we reverse the court's entry of summary judgment in DOC's favor.

> **1.  Resolving all factual disputes in Watkinson's favor, it was an abuse of discretion to hold that Watkinson did not demonstrate sufficiently extreme and outrageous conduct.**

Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[25] We have recognized that such conduct is established when an average member of the community hearing the facts of the case would exclaim, "Outrageous!"[26] We generally recognize extreme and outrageous conduct when the conduct at issue may seriously damage

---

[25]  RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. L. INST. 1965), *cited in Lybrand v. Trask*, 31 P.3d 801, 803 n.4 (Alaska 2001); *see also Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 133 (Alaska 2000).

[26]  *Lybrand*, 31 P.3d at 805.

someone's wellbeing.[27]  Additionally, repeated acts or a pattern of long-term behavior can indicate that conduct is extreme and outrageous.[28]

As an initial matter, Watkinson argues that we should consider DOC's actions in the due process context when evaluating whether the conduct was extreme and outrageous.  DOC counters that because Watkinson did not plead constitutional violations in his operative complaint, he cannot raise them now.  DOC is correct that Watkinson's second amended complaint did not raise constitutional claims.

But we agree with Watkinson that constitutional rights and violations provide important context in determining whether conduct is extreme and outrageous. The constitutional dimension of a right may be based in part on the notion that that right is "necessary for the kind of civilized life and ordered liberty" envisioned by the drafters.[29]  So it follows that violating a constitutional right may indicate that the underlying conduct is intolerable to a civilized community.[30]  This conclusion aligns with Ninth Circuit precedent.  In *Rivera v. Corrections Corp. of America*, the court reversed a summary judgment order, holding that a reasonable jury could find a private

---

[27]     Examples we have addressed include repeated and severe death threats, sexual harassment and retaliatory conduct, the intentional killing of a pet, or discharging a patient from an in-home care program without consent or consultation from a doctor. *See Teamsters Loc. 959*, 749 P.2d at 358; *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 172-73 (Alaska 1999); *Richardson*, 705 P.2d at 456; *Adkins v. Collens*, 444 P.3d 187, 203 (Alaska 2019).  Painting Bible verses on one's roof to antagonize neighbors after a property dispute, however, is not extreme and outrageous.  *Lybrand*, 31 P.3d at 803-04.

[28]     For example, we have found that long-term, systematic harassment over several years was extreme and outrageous, to include a multi-year campaign to ensure an employee is terminated.  *Cameron v. Beard*, 864 P.2d 538, 548-50 (Alaska 1993); *Odom*, 999 P.2d at 133; *King v. Brooks*, 788 P.2d 707, 711 (Alaska 1990).

[29]     *Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 404 (Alaska 2004) (quoting *Baker v. City of Fairbanks*, 471 P.2d 386, 402 (Alaska 1970)); *see also Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 967 (Alaska 1997); *Sampson v. State*, 31 P.3d 88, 92 (Alaska 2001).

[30]     *See* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. L. INST. 1965).

prison company's holding of an arrestee in solitary confinement for 355 days before arraignment to be extreme and outrageous.[31] The court's rationale rested in part on the fact that the company violated the arrestee's constitutional rights, including the right to "freedom from incarceration, 'the paradigmatic liberty interest under the due process clause.' "[32] An intentional violation of constitutional rights, where potential for serious harm is clear, can rise to the level of extreme and outrageous behavior for purposes of IIED.

Accepting all factual inferences in Watkinson's favor at the summary judgment stage, the proceedings underlying his administrative segregation and disciplinary hearing were, as the superior court acknowledged, deeply flawed. Prisoners in Alaska have due process rights to call witnesses and present evidence at both disciplinary hearings and administrative segregation hearings.[33] According to Watkinson's evidence submitted on summary judgment, the process provided to him by DOC fell far short of what was required. Affidavits and evidence presented by Watkinson indicate that DOC failed to provide him with adequate notice of his right to a hearing advisor or a true opportunity to contest the facts that led to his initial placement in administrative segregation. And during Watkinson's disciplinary hearing, DOC failed to make available any evidence or witnesses he requested, relying primarily on a one-page report from the Colorado facility.

DOC may have further violated Watkinson's due process rights and its own policies when it failed to provide him with counsel at any stage. In Alaska, inmates have a right to counsel, either retained or appointed, "where the inmate's alleged infraction of the institution's regime consisted of conduct which potentially constitutes

---

[31]   999 F.3d 647, 650-51 (9th Cir. 2021).

[32]   *Id.* at 655 (quoting *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).

[33]   *McGinnis v. Stevens*, 543 P.2d 1221, 1230-32 (Alaska 1975).

a violation of the state's felony laws."[34]  This right is codified in DOC policies regarding both administrative segregation and disciplinary board hearings.[35]  DOC was on notice that Colorado officials sought charges against Watkinson.  And given the gravity of the allegation it is possible he could have been charged with a felony.[36]  Despite this, he was not provided counsel at either his administrative placement hearings or the disciplinary hearing.

That both Watkinson's administrative segregation and disciplinary hearings, held months apart, were marred by the same or similar procedural errors indicates extended, repeated misconduct that may be probative of extreme and outrageous conduct.[37]  Resolving all factual disputes in Watkinson's favor, DOC's failures in this regard amounted to more than mere "inappropriate shortcuts."  Rather, DOC's repeated failures undermined the legitimacy of the hearing processes to which Watkinson was entitled.

Perhaps most probative of the nature of DOC's conduct is Watkinson's assertion that DOC had already predetermined the results of the hearings and appeals to which he was entitled, such that he would remain in administrative segregation for an extended and indefinite period of time.  This assertion is supported by his affidavit about statements of various corrections officers.  Following the initial report of Watkinson's alleged assault on a Colorado prison official, the DOC director instructed

---

[34]     *Id.* at 1235.

[35]     22 AAC 05.440(e); DOC POLICY 804.01, *supra* note 4, VII.C.1; DOC POLICY 809.04, *supra* note 8, D.4.

[36]     Under Colorado law, assault in the second degree is a class four felony that occurs when a person, "[w]hile lawfully confined or in custody, . . . knowingly and violently applies physical force against the person of a peace officer, . . . engaged in the performance of his or her duties."  Colo. Rev. Stat. § 18-3-203(1)(f), (2)(b) (2003).

[37]     *See, e.g.*, *Cameron v. Beard*, 864 P.2d 538, 548-50 (Alaska 1993) (concluding evidence of repeated misconduct supportive of finding outrageous conduct).

that Watkinson was to be placed on administrative segregation when he arrived in Alaska. This initial determination appears arguably supported by the information available at the time; however, Watkinson has set forth evidence that, since that time, each hearing and appeal opportunity was not only procedurally deficient but also predetermined against him. According to Watkinson, the hearing officer presiding over his first segregation hearing stated she was "told" to place Watkinson on Ad Seg 10. After that hearing, Watkinson alleges he was discouraged from appealing his placement decision. Regarding the disciplinary hearing, the involved officers admitted several procedural deficiencies and agreed that Watkinson had already served sufficient time in segregation at the time of the disciplinary decision.

Watkinson's assertion that his fate was predetermined is further supported by his allegations about the Step Down program and the numerous instances in which DOC officials seemed to discourage him from exercising his right to appeal further. When Watkinson challenged aspects of the Step Down program, he was told that he should "choose wisely" so that he could "return to [the general] population much sooner." After he joined the program, his good behavior in segregation seemed immaterial to the decision to keep him in segregation; rather, he was directed repeatedly and without explanation to continue the program. Watkinson explains that he did not appeal any of his placement hearings after the first such hearing in September 2013 because it would have served only to extend his stay in segregation. Indeed, at one point DOC officials noted his "continued focus on appe[a]ling" was "not conducive" to rehabilitation.

Determining all factual issues and drawing all inferences in favor of Watkinson, the evidence demonstrates that DOC had decided — prior to any hearing — that he would spend an extended time in administrative segregation, and that DOC then held administrative and disciplinary hearings in a perfunctory manner to

nominally comply with procedure. In this sense Watkinson's fate was sealed before he had a chance to defend himself — an intolerable prospect.[38]

Watkinson also argues that a further indicator of extreme and outrageous conduct is that DOC gave him a sentence of "Time Served" but continued to hold him in administrative segregation. DOC counters that the punitive and administrative segregation processes are separate from each other and that a determination in one does not necessarily impact the other process. DOC is correct, and in many circumstances, there may be a reason to hold an inmate in administrative segregation after the end of their punitive segregation.

But the record makes clear that, here, the processes were linked. The superior court concluded that Watkinson's placement in administrative segregation was "clearly based" on the flawed disciplinary hearing. He was initially placed in administrative segregation because of the alleged Colorado assault incident, and the initial decision that he remain in segregation was predicated on the completion of the Disciplinary Board process. DOC told Watkinson he would be able to defend the allegations before the Disciplinary Board. And then, following a flawed Disciplinary Board hearing where he was sentenced to "Time Served," Watkinson was nevertheless kept in administrative segregation for another 389 days. The record reflects no grounds for placing Watkinson in administrative segregation other than the alleged assault. By

---

[38]     Indeed, this practice may also violate Watkinson's federal constitutional due process rights to meaningful hearings on review of his initial and continued placement in solitary confinement. *See Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 483 (1995); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (holding due process requires opportunity to be heard "at a meaningful time and in a meaningful manner"); *Johnson v. Ryan*, 55 F.4th 1167, 1199-1201 (9th Cir. 2022); *Isby v. Brown*, 856 F.3d 508, 526-28 (7th Cir. 2017) (noting that periodic reviews of administrative segregation status must be meaningful and open to possibility of different outcome, especially outcome that administrative segregation is no longer necessary).

declaring Watkinson a danger to the safety of the facility based on the procedurally deficient disciplinary hearing, DOC was able to hold him in what was effectively punitive segregation significantly longer than regulations would otherwise permit.[39]

All of this resulted in Watkinson spending an extensive period of time in administrative segregation — 504 days. Based on the record before the superior court, we conclude that Watkinson set forth evidence supporting genuine issues of material fact related to DOC's conduct sufficient to survive summary judgment. Moreover, resolving all factual disputes in Watkinson's favor, he demonstrated that DOC's conduct was extreme and outrageous so as to meet the threshold necessary to support an IIED claim. The superior court's decision that DOC's conduct did not rise to the level of extreme and outrageous, even after drawing all factual inferences in Watkinson's favor, was an abuse of discretion.[40]

### 2. It was an abuse of discretion to determine that Watkinson's emotional distress was insufficiently severe to support an IIED claim.

To establish an IIED claim, a plaintiff must demonstrate not only extreme and outrageous behavior by the defendant, but also severe emotional distress: "distress of such substantial quantity or enduring quality that no reasonable person in a civilized society should be expected to endure it."[41] "Examples of serious emotional distress may include 'neuroses, psychoses, chronic depression, phobia, and shock.' However, temporary fright, disappointment or regret does not suffice under this standard."[42]

---

[39] The maximum allowable punitive segregation is 60 days for a major infraction. 22 AAC 05.470(a)(3).

[40] *See Richardson v. Fairbanks North Star Borough*, 705 P.2d 454, 456 (Alaska 1985); *Jones v. State, Dep't of Corr.*, 125 P.3d 343, 346 (Alaska 2005).

[41] *Teamsters Loc. 959 v. Wells*, 749 P.2d 349, 357 (Alaska 1988).

[42] *Fyffe v. Wright*, 93 P.3d 444, 456 (Alaska 2004) (quoting *Chizmar v. Mackie*, 896 P.2d 196, 204 (Alaska 1995)); *see also Nelson v. Progressive Corp.*, 976

Serious mental distress exists when "a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case."[43]

Plaintiffs' affidavits describing their mental state, along with affidavits of other witnesses, may be sufficient evidence to support a threshold finding of severe emotional distress.[44] Testimony from a mental health professional may be helpful but is not necessary.[45] Additionally, the plaintiff's demonstration of particular circumstances may be sufficient to show that a "plaintiff has actually suffered serious emotional trauma,"[46] considering what one would "naturally suffer" in response to those circumstances.[47]

Watkinson argues that the superior court applied the wrong legal standard when it granted summary judgment against him because his emotional distress was not more severe than "what any prisoner might experience in segregation or solitary

---

P.2d 859, 868 (Alaska 1999) (testimony from plaintiff and his father that he was angry and "red in the face" after mishandling of insurance claim not severe emotional distress).

[43] *Chizmar*, 896 P.2d at 204 (quoting *Rodrigues v. State*, 472 P.2d 509, 520 (Haw. 1970)); *see also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (AM. L. INST. 1965) ("The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.").

[44] *Teamsters Loc. 959*, 749 P.2d at 360; *see also Fyffe*, 93 P.3d at 456 (holding that denying an IIED claim based on testimony of sympathetic witnesses alone within fact-finder's discretion).

[45] *Compare Wal-Mart, Inc. v. Stewart*, 990 P.2d 626, 636 (Alaska 1999) (listing psychiatrist's testimony to support upholding that plaintiff's emotional distress was sufficiently severe), *with Norcon, Inc. v. Kotowski*, 971 P.2d 158, 173 (Alaska 1999) (upholding IIED claim based on plaintiff's testimony).

[46] *Chizmar*, 896 P.2d at 205.

[47] *Norcon*, 971 P.2d at 173; *see also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (AM. L. INST. 1965) ("[I]n many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.").

confinement." We agree with Watkinson. This is not the correct legal standard for analyzing whether emotional distress rises to the level necessary to support an IIED claim. The court's summary judgment order stated that "IIED claims have traditionally rested on a showing of *severe* emotional distress — not simply the ordinary emotional distress any person might experience in the same situation." But this misstates the emotional distress component of an IIED claim. Whether a plaintiff's emotional distress was severe is not determined by whether a plaintiff suffers the same level of emotional distress that a reasonable person would experience under the same circumstances.[48] Indeed, if a plaintiff suffers *more* than the reasonable person would under the circumstances, the defendant is not liable for additional damages, unless that extreme distress results from a known susceptibility to such harm.[49] The question is not whether Watkinson's distress was worse than what an ordinary prisoner would experience under the circumstances, but whether an ordinary prisoner could endure the same extreme circumstances that he experienced.

The superior court's approach also contradicts our precedent indicating that evidence of extreme circumstances in itself may support a determination that a plaintiff suffered severe emotional distress.[50] Not every stay in administrative segregation will give rise to extreme emotional distress, and there is no set amount of time that is particularly indicative of emotional distress.[51] Rather, we emphasize that

---

[48]    *Fyffe*, 93 P.3d at 456 (quoting *Teamsters Loc. 959*, 749 P.2d at 359 n.14).

[49]    "The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress." RESTATEMENT (SECOND) OF TORTS § 46, cmt. j (AM. L. INST. 1965).

[50]    *Norcon*, 971 P.2d at 173.

[51]    *Jones v. State, Dep't of Corr.*, 125 P.3d 343, 351-53 (Alaska 2005) (Carpeneti, J., concurring) (prisoner plaintiff had not shown sufficient emotional distress to overcome summary judgment).

in general, the circumstances that gave rise to the plaintiff's emotional distress are an important piece of a holistic inquiry into whether the distress was "severe." Here, Watkinson was held in administrative segregation for 504 days, significantly longer than periods that we and other courts have previously determined to be an ordinary incident of prison life.[52] Courts have widely recognized that extended time in solitary confinement can negatively impact an inmate's mental health.[53] Moreover, Watkinson contends that DOC's denial of his right to due process, and the shifting and often unclear path to return to ordinary prison life, further compounded his distress.

---

[52] *Compare DeRemer v. Turnbull*, 453 P.3d 193, 199 (Alaska 2019) (holding ten-day placement in punitive segregation not atypical and significant hardship), *and Sandin v. Conner*, 515 U.S. 472, 486 (1995) (holding 30 days in solitary confinement an ordinary incident of prison life), *with Rivera v. Corr. Corp. of Am.*, 999 F.3d 647, 655 (9th Cir. 2021) (holding that 355 day detention in administrative segregation without arraignment was "egregious"), *and DeRemer v. State, Dep't of Corr.*, No. S-14647, 2014 WL 4952503, at *7 (Alaska Oct. 1, 2014) (holding that prisoner had protected liberty interest when hearing was for high moderate infraction and punishment was 20 days in punitive segregation).

[53] *See Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring) ("The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators."); *Ruiz v. Texas*, 580 U.S. 1191, 1191-92 (2017) (Breyer, J., dissenting from denial of stay of execution) (noting human toll of 20 years of solitary confinement exacerbated as prisoner awaited execution); *Apodaca v. Raemisch*, 139 S. Ct. 5, 10 (2018) (Sotomayor, J., concurring in the denial of writ of certiorari) (noting courts should be aware of "problems raised by keeping prisoners . . . in 'near-total isolation' from the living world, in what comes perilously close to a penal tomb" (citation omitted)). Several circuit courts agree that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, especially those with an underlying, severe mental illness. *See Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019); *Clarke v. Coupe*, 55 F.4th 167, 179-80 (3d Cir. 2022). *But see Giles v. Godinez*, 914 F.3d 1040, 1051-52 (7th Cir. 2019) (concluding no objective risk of mental injury from segregation). *See also generally Stuart Grassian, Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006) (noting common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors).

Watkinson's evidence on summary judgment related to the nature of his distress is also significant. Watkinson attested that, while in segregation, he suffered from an array of severe psychological symptoms, including acute anxiety, insomnia, panic attacks, disassociation, social withdrawal, a severe depressive state, and suicidal ideation, many of which continued after his time in segregation. Watkinson also provided affidavits from those who visited him corroborating his severe distress, including Watkinson uncharacteristically weeping. Watkinson further explained his alleged failure to report his distress: he feared the forcible administration of medication or suicide watch. He also explained that the counselors to whom he did express his distress did not provide any testimony at the summary judgment stage.

Finally, Watkinson set forth evidence that he has a demonstrated history of mental illness that could cause him to be particularly vulnerable to the impacts of administrative segregation, and that DOC should reasonably have been aware of his mental health history. He points more specifically to the presentencing mental health report that details his mental health diagnoses at that time, including very severe dysthymia and depression. According to Watkinson, his mental illness has gone untreated while incarcerated and was exacerbated by his time in segregation.

DOC argues that Watkinson only experienced ordinary anger and frustration, pointing to his continued denial of mental health issues during check-ins and his successful progression through the Step Down program. The Chief Mental Health Officer noted that Watkinson never expressed any mental or emotional distress to prison staff and that he learned to cope with any distress through meditation. This evidence, if uncontradicted, might satisfy the State's burden as the summary judgment movant to demonstrate entitlement to judgment as a matter of law.[54] But here

---

[54] *Blair v. Fed. Ins. Co.*, 433 P.3d 1048, 1051 (Alaska 2018) (citing *Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002)).

Watkinson set forth specific, admissible evidence that "reasonably tend[s] to dispute or contradict the movant's evidence."[55]

We conclude first that Watkinson set forth sufficient evidence to demonstrate genuine issues of material fact regarding the nature of his distress caused by DOC's conduct. Moreover, assuming Watkinson's assertions to be true, we conclude that his emotional distress was sufficiently severe to meet the required threshold for an IIED claim. The superior court's decision otherwise, facilitated by use of an incorrect legal standard, was an abuse of discretion.[56]

In light of our holdings that Watkinson made a sufficient showing of extreme and outrageous conduct on the part of DOC and of resulting severe emotional distress, we reverse the superior court's grant of summary judgment to DOC on Watkinson's IIED claim.

**B.      The Superior Court Did Not Err When It Found DOC Had No Preexisting Duty That Would Allow For A Claim Of Negligent Infliction Of Emotional Distress.**

"Alaska law permits individuals to recover damages on the basis of emotional distress" due to negligent conduct under limited circumstances.[57] Generally, damages are not available without a physical injury, except under two narrow exceptions: the bystander exception and the preexisting duty exception.[58] The pre-existing duty exception is narrow.[59] A plaintiff can recover only based on a contractual

---

[55]      *Alakayak*, 48 P.3d at 448 (quoting *Philbin v. Matanuska-Susitna Borough*, 991 P.2d 1263, 1266 (Alaska 1999)).

[56]      *Id.*

[57]      *Schack v. Schack*, 414 P.3d 639, 641 (Alaska 2018) (citing *Kallstrom v. United States*, 43 P.3d 162, 165 (Alaska 2002)).

[58]      *Id.* The superior court determined that the bystander exception does not apply in this case, and neither party disputes that conclusion.

[59]      *Kallstrom*, 43 P.3d at 166.

-25-                                                        7677

or fiduciary relationship,[60] or in other very limited circumstances when a special duty may arise.[61] To determine whether such a preexisting duty existed without a contractual or fiduciary relationship, we apply the seven-factor test adopted in *D.S.W. v. Fairbanks North Star Borough School District*.[62] We affirm the superior court's determination that there was no preexisting duty here that would allow for Watkinson to pursue emotional distress damages caused by negligence.

The superior court correctly noted that the State as jailer has a duty to exercise reasonable care for the protection of a prisoner's life and health similar to a common carrier because prisoners are "confined and cannot avail themselves of normal opportunities for self-protection."[63] "[W]hen the jailer knows or reasonably should have foreseen that [a] prisoner was "incapacitated, suicidal, or otherwise 'in danger,' " a higher degree of care, the "utmost caution," is warranted to protect the prisoner from physical harm.[64] But "the duty to protect is not limitless — the prison 'should not be the insurer of the prisoner's safety.' "[65]

---

[60] *Caudle v. Mendel*, 994 P.2d 372, 376 (Alaska 1999).

[61] *Chizmar v. Mackie*, 896 P.2d 196, 203-05 (Alaska 1995) (recognizing duty to prevent emotional harm from serious misdiagnoses, such as misdiagnosis of AIDS, in doctor-patient relationship).

[62] 628 P.2d 554, 555 (Alaska 1981) (quoting *Peter W. v. S.F. Unified Sch. Dist.*, 131 Cal. Rptr. 854, 859-60 (Cal. App. 1976)); *Kallstrom*, 43 P.3d at 167.

[63] *Wilson v. City of Kotzebue*, 627 P.2d 623, 628 (Alaska 1981).

[64] *State, Dep't of Corr. v. Johnson*, 323 P.3d 56, 60 (Alaska 2000) (quoting *Wilson*, 627 P.2d at 628); *see also Mattox v. State, Dep't of Corr.*, 323 P.3d 23, 26-28 (Alaska 2014) (holding that duty of care extends to duty to prevent "reasonably foreseeable" harm, including attacks by other prisoners); *Joseph v. State*, 26 P.3d 459, 473-77 (Alaska 2001) (holding duty of care extends to duty to prevent "reasonably foreseeable suicide attempts" and intentionality of suicide does not absolve prison of duty to prevent harm).

[65] *Mattox*, 323 P.3d at 28 (quoting *Joseph*, 26 P.3d at 477).

Watkinson argues on appeal that this duty is in fact a fiduciary one, because DOC exercises "complete control and dominance" over prisoners. But this argument misstates the nature of a fiduciary relationship. In Alaska a fiduciary relationship "exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence."[66] The jailer-prisoner relationship does not arise from the special confidence required for a fiduciary relationship,[67] and no other jurisdiction we are aware of recognizes that a fiduciary relationship exists between a jailer and a prisoner.[68] We agree with the superior court that the relationship between a jailor and prisoner is not one of a fiduciary.

The superior court next looked to the seven-factor test adopted in *D.S.W.* to determine whether the prisoner-jailor relationship supports an exceptional duty under the circumstances.[69] *D.S.W.* sets out seven factors that courts should consider when determining whether a duty of care giving rise to NIED liability exists, including "the extent of the burden to the defendant and consequences to the community of imposing

---

[66]     *Williams v. Baker*, 446 P.3d 336, 340 (Alaska 2019) (quoting *Seybert v. Cominco Alaska Expl.*, 182 P.3d 1079, 1090 (Alaska 2008)).

[67]     *Dapo v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 454 P.3d 171, 179-80 (Alaska 2019) (holding Office of Children's Services has fiduciary duty to children in its custody); *Thomas v. Archer*, 384 P.3d 791, 797 (Alaska 2016) (describing physician's fiduciary duty to patients based on special expertise).

[68]     *See Rua v. Glodis*, 52 F. Supp. 3d 84, 100 (D. Mass. 2014); *Sperry v. Corizon Health, Inc.*, No. 18–3119–SAC, 2020 WL 905745, at *3 (D. Kan. Feb. 25, 2020); *Williams-Bey v. Carpenter*, No. 14–0490–CG–C, 2015 WL 4602871, at *9 (S.D. Ala. July 29, 2015); *Hernandez v. Cate*, No. EDCV 11–00627 R(AJW), 2014 WL 6473769, at *3 (C.D. Cal. Oct. 16, 2014).

[69]     *Kallstrom v. United States*, 43 P.3d 162, 167 (Alaska 2002); *Schack v. Schack*, 414 P.3d 639, 644 (Alaska 2018).

a duty to exercise care."[70]   Here, the superior court found that the *D.S.W.* factors generally weighed against finding an exceptional duty in this situation, with only one factor, the foreseeability of harm to inmates, weighing in favor of finding such a duty.

As the court correctly noted, our case law generally has emphasized the narrowness of the preexisting duty exception and our reluctance to open up broad and potentially expansive categories of new litigants that could unduly burden the community.[71]  For example, we have declined to find a duty to prevent the emotional distress a negligent driver caused her parents after she perished in a car accident, noting that "instances of individuals negligently injuring or killing themselves are not limited to car accidents," and that such new liability could be limitless.[72]  We also have declined to allow plaintiffs who are "unwitting instruments" resulting in harm to another to collect damages for NIED, because unwitting instruments are "a diverse group" and the category is so broad as to provide no distinction for when liability should apply.[73]

---

[70]      *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981) (quoting *Peter W. v. S. F. Unified Sch. Dist.*, 131 Cal. Rptr. 854, 859-60 (Cal. App. 1976)).  The other six factors are:

> [1] The foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, . . . and [7] the availability, cost[,] and prevalence of insurance for the risk involved.

> *Id.*

[71]      *Schack*, 414 P.3d at 645-46.

[72]      *Id.* at 645.

[73]      *Kallstrom*, 43 P.3d at 163, 167-68 (defining an unwitting instrument as "a plaintiff who becomes a participant in the infliction of another's injuries through the negligence of the defendant").

Similarly, we have declined to allow liability for emotional harm to the parents of a murder victim when the identification of her remains was delayed due to errors in the investigation, because the introduction of liability could open "floodgates" of litigation and divert important executive resources.[74] We are also reluctant to find a duty when there are other policies or protections for potential plaintiffs in place.[75] For example, in *Karen L.* we held that there was no heightened duty of care for social workers to prevent the emotional harm suffered by parents who have lost custody of their children, given the other procedural protections in place for parents in child in need of aid proceedings.[76]

Here, we are particularly concerned that allowing negligence claims for pure emotional injury in the jailor-prisoner context would create an unwieldy and overly broad group of potential plaintiffs.[77] DOC has established procedures for inmates to address grievances and policy errors; adding liability for emotional injury here would expand litigation without necessarily providing sufficient incentive to improve outcomes of those procedures. Overall, the *D.S.W.* factors weigh against imposition of a preexisting duty that could support an NIED claim in this case.

We agree with the superior court's holding that the jailor-prisoner relationship does not give rise to a type of preexisting duty required to establish liability for NIED, and we agree that the *D.S.W.* factors do not support embracing a new type of preexisting duty in this case. We therefore affirm the superior court's grant of summary judgment and dismissal of Watkinson's NIED claim.

---

[74] *Hawks v. State, Dep't of Pub. Safety*, 908 P.2d 1013, 1017 (Alaska 1995).

[75] *Karen L. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 953 P.2d 871, 876 (Alaska 1998).

[76] *Id.*

[77] *Kallstrom*, 43 P.3d at 167-68.

**C.** **The Court Erred In Approving The Attorney General's Certification That DOC Officials Were Acting Within The Scope Of Their Employment.**

Alaska Statute 09.50.253 addresses tort claims against state employees acting within the scope of their employment.[78] Under the statute, if the attorney general certifies that a state employee was acting within the scope of employment when the claim arose, then the claim is against the State and the State is automatically substituted as a party defendant.[79] The "scope of employment" is defined as acts or omissions

> (A) that the State employee is employed or authorized to perform;
> (B) of the State employee that occur substantially within the authorized time and space limit;
> (C) that are activated by a purpose to serve the State; and
> (D) that do not constitute acting, or failing to act, with wilful, reckless, or intentional misconduct, or with gross negligence or malice[.][80]

Part (D) of this statute broadly prohibits the attorney general from certifying that an intentional tort was within the scope of employment. This statutory definition is distinct from the definition of "scope of employment" that we have adopted for private employers and municipalities, which includes intentional torts if they are foreseeable based on the type of employment.[81] This difference allows suits for

---

[78]    AS 09.50.253(a).

[79]    AS 09.50.253(c).

[80]    AS 09.50.253(h)(1).

[81]    *Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 347 (Alaska 1990) (quoting RESTATEMENT (SECOND) OF TORTS § 228 (AM. L. INST. 1958)). This includes situations where "force is intentionally used," so long as that force is not unexpected by the employer. *Id.*; *see also Lane v. City of Juneau*, 421 P.3d 83, 94-96 (Alaska 2018) (reversing summary judgment in favor of City after campground employee started drinking with campers, noting that even crimes and intentional torts may be within scope of employment); *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 350-51 (Alaska 1982) (union liable for steward's threat of force in representing members).

intentional torts against state employees to proceed, even though the state is largely immune from those suits.[82]

The plaintiff can challenge a certification decision made by the State.[83] The superior court must review the certification decision de novo, and "the burden of proof lies with the plaintiff challenging certification to prove that the defendants were not acting within the scope of their employment."[84] The superior court, not the jury, should decide certification before trial.[85]

Whether an employee was acting within the scope of employment is a fact-intensive analysis, especially when determining questions of intent.[86] "If there are disputed issues of fact," the court must "hold an evidentiary hearing and make factual findings" to decide the certification question.[87] "If no disputed issues of material fact exist, the court may resolve the issue on summary judgment."[88]

---

[82]     *See* AS 09.50.250(3) (listing intentional torts from which the state is immune); Minutes, Sen. Jud. Comm. Hearing on S.B. 338, 23d Leg., 2d Sess. 9-10 (Mar. 24, 2004) (testimony of Gail Voightlander, Assistant Att'y Gen.), https://www.akleg.gov/PDF/23/M/SJUD2004-03-240810.pdf (noting that certification would not occur if there was intentional misconduct, preserving ability to sue state employees for intentional torts).

[83]     *State, Dep't of Corr. v. Heisey*, 271 P.3d 1082, 1090 (Alaska 2012).

[84]     *Id.*

[85]     *Id.* at 1091.

[86]     *See Roth v. State*, No. 5:15–CV–00001–SLG, 2016 WL 614353, at *5 (D. Alaska Feb. 16, 2016) (analyzing each claim of malice, recklessness, or intentional behavior before approving certification); Minutes, Sen. Jud. Comm. Hearing on S.B. 338, 23d Leg., 2d Sess. 10 (Mar. 24, 2004) (testimony of Gail Voightlander, Assistant Att'y Gen.), https://www.akleg.gov/PDF/23/M/SJUD2004-03-240810.pdf (noting that a denial of certification would not happen based on "mere allegation[s]").

[87]     *Heisey*, 271 P.3d at 1091.

[88]     *Id.*

Here the superior court recited the correct standard for ruling on certification, but then seemed to apply a different standard for determining the scope of employment in describing its reasoning. Noting that the State is responsible for acts of its employees that are "foreseeable" and within the authorized time and space limits of their employment,[89] the court held that the carrying out of disciplinary appeals was within the scope of employment for the DOC officers. On reconsideration, the court noted that the decision "recognize[d] long-standing ten[ets] of tort and agency law that hold employers liable for the actions of their employees."

But there is a specific, statutory definition for the scope of employment that applies to certification decisions, which does not permit the attorney general to certify that alleged intentional torts committed by state employees were within the scope of employment if they were "foreseeable." Instead, the statute specifically excludes from certification instances in which state employees were "acting . . . with wilful, reckless, or intentional misconduct, or with gross negligence or malice," even if the actions meet the other components of being within the scope of employment.[90] The superior court's application of a separate rule for employer liability ignores this clear statutory exception. The superior court did not analyze the state employees' actions in this case under the statutory standard, aside from noting that Watkinson could attempt to prove malicious or willful conduct at trial. It was error to approve the Attorney General's certification without examining the state employees' actions pursuant to the standard provided in AS 09.50.253.

Because the wrong legal standard was applied in examining whether the DOC officers were acting within the scope of their employment for certification purposes, we vacate the superior court's order approving certification and remand for

---

[89] *See Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 347-48 (Alaska 1990).

[90] AS 09.50.253(h)(1)(D).

further proceedings.  We also note that Watkinson provided some evidence indicating that the named state employees acted willfully or recklessly when conducting his initial administrative segregation hearing and disciplinary hearing.  Whether this evidence creates a dispute of material fact requiring an evidentiary hearing is a question we leave for the superior court on remand.

**D.    It Was An Abuse Of Discretion To Deny Watkinson's Discovery Motion.**

Among several discovery disputes in this case was Watkinson's inquiry into DOC's decision to rescind the adverse disciplinary decision it had made against him.  Watkinson requested information and production of communications about this decision and sought the name of the official who made the decision to remove the disciplinary infraction from his record instead of defending the decision before the superior court in 2015.  The DOC official answering interrogatories responded that she did "not specifically recall who authorized the removal of the infraction."  DOC further refused to answer Watkinson's interrogatories about this issue on grounds of attorney-client privilege.  Watkinson moved for an in camera review of all communications relating to the decision to rescind the disciplinary infraction, or, in the alternative, for the superior court to compel production of the name of the individual.  The court denied Watkinson's motion, holding the State had already answered that it did not know who made the decision and that communications relating to the decision at issue are privileged.  We hold that this was an abuse of discretion.

Generally, communications between attorneys and clients for the purpose of providing legal services are privileged.[91]  We note that while Watkinson's motion was framed as a motion for in camera review of certain communications that may have been privileged, he also made it clear he was ultimately asking DOC to identify the official who directed the removal of the disciplinary infraction from his record.  The

---

[91]    Alaska R. Evid. 503(b), (d).

identity of this official is not a communication for the purpose of providing legal services and therefore is not protected by the attorney-client privilege. Moreover, DOC's discovery response indicating that it did not recall who authorized the removal of the infraction was clearly insufficient. An official answering discovery requests on behalf of an entity cannot merely claim not to have personal knowledge but must investigate what the entity as a whole may know.[92]

Because the name of the official in itself is not privileged and is likely within the scope of DOC's knowledge, we hold that it was an abuse of discretion for the court not to order DOC to provide that requested information.[93]

## V. CONCLUSION

We REVERSE the superior court's grant of summary judgment on Watkinson's IIED claim, VACATE the court's certification order, REVERSE the denial of Watkinson's discovery motion, AFFIRM the grant of summary judgment on

---

[92] *See Hawes Firearms Co. v. Edwards*, 634 P.2d 377, 379 (Alaska 1981) (answering individual's ignorance is not justification for withholding fact when fact is known to others in the group).

[93] If DOC cannot produce the name, then an in camera review of relevant documents may become appropriate at a later stage. We leave that decision to the discretion of the superior court.

It is unclear whether DOC was attempting to raise its attorney-client privilege argument to suggest that the decision to dismiss the disciplinary matter and remove the disciplinary infraction from Watkinson's record was made on the advice of counsel. *See advice-of-counsel defense*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("2. A civil defendant's position that by seeking and following a lawyer's advice, the defendant could not have lacked good faith in the conduct that has allegedly given rise to liability. [] Typically, a defendant must show full disclosure of all material facts to the lawyer coupled with actual reliance on the lawyer's advice in the good-faith belief that the conduct was permissible."); *Wheeler v. State*, 659 P.2d 1241, 1253-54 (Alaska App. 1983) (noting, in criminal matters, dearth of Alaska case law on advice-of-counsel defense and explaining defense's application to relevant mental states). If DOC is asserting this defense, that would require the superior court to delve into whether DOC is waiving the attorney-client privilege.

Watkinson's NIED claim, and REMAND for further proceedings consistent with this decision.